# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **FILED UNDER SEAL** |
| Plaintiff, | Case No. 8:24-cv-1459-JLB-AAS |
| v. | **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENTS, AND OTHER RELIEF** |
| LEGION MEDIA, LLC, a limited liability company; | |
| | **PRELIMINARY AND PREMANENT INJUNCTIVE RELIEF REQUESTED** |
| KP COMMERCE, LLC, also doing business as BOTANICAL FARMS, BUY BLISS BRANDS, BUY SUPREME CBD, BUY TRIPLEX BOOST, OPTIMAL MAX, TRULY BOOST KETO, TRULY KETO, TRULY MAX BRANDS, TRULY TOTAL HEALTH, TRULY TOTAL KETO, and TRULY MAX BRANDS, a limited liability company; |  |
| PINNACLE PAYMENTS, LLC, also doing business as CHALLENGE BODY MIND and FITNESS PRO, a limited liability company; | JUN 17 2024 PM 12:11 FILED - USDC - FLMD - TPA |
| SLOAN HEALTH PRODUCTS, LLC, a limited liability company; | |
| HARSHIL TOPIWALA, individually and as an owner and officer of LEGION MEDIA, LLC, KP COMMERCE, LLC and PINNACLE PAYMENTS, LLC; | |
| KIRTAN PATEL, also known as KITS PATEL, individually and as an owner and officer of KP COMMERCE, LLC and PINNACLE PAYMENTS, LLC; | |

1

MANINDRA GARG, individually and as a
principal and owner of SLOAN HEALTH
PRODUCTS, LLC,

  Defendants

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for
its Complaint alleges:

1.      The FTC brings this action for Defendants' violations of Section
5(a) of the FTC Act, 15 U.S.C. § 45(a), Sections 3 and 4 of the Restore Online
Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. §§ 8402 and 8403, and
Section 907(a) of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §
1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).  For
these violations, the FTC seeks relief, including a temporary, preliminary,
and permanent injunction, monetary relief, and other relief, including an
asset freeze, the appointment of a receiver, and immediate access to the
Defendants' business premises, pursuant to Sections 13(b) and 19 of the FTC
Act, 15 U.S.C. §§ 53(b) and 57b, Section 5 of ROSCA, 15 U.S.C. § 8404, and
Section 918(c) of EFTA, 15 U.S.C. § 1693o(c).

## SUMMARY OF THE CASE

2.      Since at least 2021, Defendants Harshil Topiwala and Kirtan
Patel have operated or participated in online unauthorized-billing scams that
have taken over $200 million dollars from consumers, using unlawful tactics

2

perpetrated through entities they control, including Legion Media, LLC, KP Commerce, LLC, and Pinnacle Payments, LLC (collectively with Defendants Topiwala and Patel, the "Legion Media Defendants").

3.      The Legion Media Defendants primarily market and sell over the Internet cannabidiol-related products (more commonly known as CBD) and other purported diet and cosmetic products that allegedly promote weight loss, clear skin, and pain relief, among other things.  The Legion Media Defendants charge consumers more than the product prices shown online to consumers during the ordering process.  The Legion Media Defendants also enroll consumers, without their knowledge or consent, in continuity programs that charge them for additional supplies of products and memberships to access online purported health and wellness resources they never consented to purchase.

4.      Since at least December 2022, the Legion Media Defendants have operated as a common enterprise or de facto partnership with Defendants Manindra Garg and Sloan Health Products, LLC (the "Sloan Health Defendants"), with regard to the sale of purported diet and cosmetic products sold through undisclosed continuity programs.  The Sloan Health Defendants package, distribute, and handle the returns of these products, and share in the profits of the scam.  They also worked together with the Legion Media Defendants to perpetuate the scheme by concealing the Defendants' identities

3

from consumers.

5.    In addition, the Legion Media Defendants participate in other unauthorized-billing scams where consumers are subjected to recurring unauthorized charges after they use their credit card to pay a small shipping fee to receive a gift (such as ear buds) after the consumer is told, falsely, that they won the gift from a recognized business (such as Verizon or Ace Hardware).  The Legion Media Defendants participate in these business impersonation scams by managing over one hundred merchant accounts, using shell companies and straw owners, that are needed to accept consumers' credit and debit card payments.  This practice of processing credit card transactions through shell entities' merchant accounts is known as "credit card laundering," and it is an unlawful practice used by fraudulent merchants to circumvent credit card associations' monitoring programs and avoid detection by consumers and law enforcement.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

7.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

8.    The FTC is an independent agency of the United States

4

Government created by the FTC Act, which authorizes the FTC to commence
this district court civil action by its own attorneys.  15 U.S.C. §§ 41–58.  The
FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits
unfair or deceptive acts or practices in or affecting commerce.  The FTC also
enforces ROSCA, 15 U.S.C. §§ 8401-8405, which prohibits merchants from
selling goods or services on the Internet through negative option marketing
without meeting certain requirements to protect consumers.  A negative
option is an offer in which the seller treats a consumer's silence as consent to
be charged for goods or services.  Additionally, the FTC enforces EFTA, 15
U.S.C. §§ 1693 *et seq.*, which regulates the rights, liabilities, and
responsibilities of participants in electronic fund transfer systems.

## DEFENDANTS

9.     Defendant Legion Media, LLC ("Legion Media") is a New Mexico
limited liability company which has used as an office address a residential
address in Orlando, Florida, and the address of a private mailbox provider at
317 Commercial Street NE, Suite A, #148, Albuquerque, New Mexico.  Legion
Media transacts or has transacted business in this District and throughout
the United States.  At times relevant to this Complaint, acting alone or in
concert with others, Legion Media has advertised, marketed, distributed, or
sold products to consumers throughout the United States.

10.    Defendant KP Commerce, LLC ("KP Commerce") is a New

Mexico limited liability company which has used as on office address a residential address in Tampa, Florida, and the address of a private mailbox provider at 320 Gold Avenue SW, Suite 620 PMB 2271, Albuquerque, New Mexico. KP Commerce transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, KP Commerce has advertised, marketed, distributed, or sold products to consumers throughout the United States.

11.     Defendant Pinnacle Payments, LLC ("Pinnacle Payments") is a New Mexico limited liability company which has used as an office address a residential address in Orlando, Florida, and the address of a private mailbox provider at 320 Gold Avenue SW, Suite 620 PMB 1461, Albuquerque, New Mexico. Pinnacle Payments transacts or has transacted business in this District and throughout the United States. At times relevant to this Complaint, acting alone or in concert with others, Pinnacle Payments has advertised, marketed, distributed, or sold products to consumers throughout the United States.

12.     Defendant Sloan Health Products, LLC ("Sloan Health") is a Florida limited liability company which uses 500 North West Shore Boulevard, Suite 955, Tampa, Florida as an office address, and operates a warehouse located at 1900 Midway Lane, Smyrna, Tennessee. Sloan Health

6

provides products and fulfillment services consisting of labeling, packaging, and product returns to online marketers selling purported diet and cosmetic products including the Legion Media Defendants.  In 2019, the Better Business Bureau notified Sloan Health that consumers had submitted complaints about incurring unauthorized charges relating to products distributed by Sloan Health.

13.     The Legion Media Defendants are the primary marketer that Sloan Health provides fulfillment services and ships products for from its warehouse in Smyrna, Tennessee.  From December 2021 to December 2023, Sloan Health received over $30 million in payments from the Legion Media Defendants.   Sloan Health transacts or has transacted business in this District and throughout the United States.

14.     Defendant Harshil Topiwala was a resident of Orlando, Florida at times relevant to this Complaint.  He currently is a resident of the United Kingdom.  He is the owner and President of Legion Media and Pinnacle Payments, and an owner and principal of KP Commerce.  Topiwala signed applications for Legion Media and Pinnacle Payments to open merchant accounts in the United States.  He also opened and maintains multiple bank accounts in the United States for Legion Media and Pinnacle Payments. Topiwala is also a signatory on bank accounts in the United States for KP Commerce.  Topiwala uses bank accounts in the United States for Legion

7

Media, Pinnacle Payments, and KP Commerce to receive and redistribute funds from consumer purchases in the United States, and to make payments to recruit straw signers in the United States to open merchant accounts.

15. Since 2021, Topiwala has transferred millions of dollars out of Legion Media and Pinnacle Payments bank accounts in the United States and into offshore bank accounts belonging to Topiwala and to fund purchases using a Legion Media credit card for private jet travel, luxury cars, jewelry, and trips around the world, including to Barcelona, Dubai, Lake Como, Las Vegas, Miami, Mikonos, Singapore, and St. Tropez.

16. At all times relevant to this Complaint, acting alone or in concert with others, Defendant Topiwala has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint. Defendant Topiwala, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

17. Defendant Kirtan Patel is a resident of Tampa, Florida. He is an owner and President of KP Commerce and a principal of Pinnacle Payments. Patel signed merchant account applications for KP Commerce. He also opened and maintains bank accounts for KP Commerce and Pinnacle Payments, and signed agreements on behalf of Pinnacle Payments with individuals recruited as straw signers to open merchant accounts. At all

8

times relevant to this Complaint, acting alone or in concert with others, Defendant Patel has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described in this Complaint. Defendant Patel resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

18.    Defendant Manindra Garg is a resident of Tampa, Florida. He is the principal and owner of Sloan Health Products. He has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Sloan Health Products, including the acts and practices described in this Complaint. Since October 2023, Garg has transferred a net total of $4 million from a Sloan Health bank account to a personal brokerage account. Defendant Garg resides in this District and, in connection with the matters alleged herein, transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE AND PARTNERSHIP

19.    Defendants Legion Media, KP Commerce, and Pinnacle Payments (collectively, the "Legion Media Entities") are closely held companies that have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. They have conducted the business practices described below through interrelated companies that have common

9

ownership, officers, business functions and practices, and office locations. Because the Legion Media Entities have operated as a common enterprise, each of them is liable for the acts and practices alleged below.

20.     Defendant Legion Media is controlled by Defendant Topiwala and receives payments from consumers for purported health and wellness products marketed and sold online by Defendants KP Commerce and Pinnacle Payments.  Consumer funds are funneled through KP Commerce's and Pinnacle Payments' bank accounts into Legion Media's bank accounts.

21.     Topiwala is the owner of Legion Media and Pinnacle Payments. Patel is listed as the owner for KP Commerce on applications for merchant accounts.  Topiwala and Patel are both signatories on bank accounts for KP Commerce and Pinnacle Payments.  Patel also uses a Legion Media email address to conduct business for Legion Media.

22.     The Legion Media Entities use the same office locations.  KP Commerce and Pinnacle Payments each used virtual mailboxes from the same private mailbox provider located at 320 Gold Avenue SW, Suite 620, Albuquerque, New Mexico.  Legion Media and Pinnacle Payments have used the same residential address in Orlando, Florida as a business address.

23.     Defendants Topiwala and Patel have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Legion Media Entities that constitute the common enterprise.

10

24.     Since at least December 2022, the Legion Media Entities have operated as a common enterprise or partnership with Sloan Health while engaging in the unlawful practices alleged below with regard to the sale of purported diet and cosmetic products sold through undisclosed continuity programs.

25.     The Legion Media Entities and Sloan Health arranged to share in the profits of the unlawful personal products billing scheme and have in fact financially benefitted from the scheme. They have coordinated their roles to conceal their identities in order to further perpetuate the scheme as alleged below.

26.     In addition to providing fulfillment services for the Legion Media Entities, Sloan Health has also provided funding to KP Commerce, transferring at least $685,000 from January 2023 to January 2024.

27.     Sloan Health and Legion Media have each received profit distributions totaling at least $10 million dollars since December 2022. The table in Figure 1 identifies the profit distributions from Defendant KP Commerce to Defendants Sloan Health and Legion Media. These payments were initially described in bank records as "Commission Disbursements," and were made on the same day to both entities in the same amounts.

**Figure 1: Distributions from KP Commerce to Legion Media and Sloan Health Products from December 2022 to December 2023**

| Transaction Date | Legion Media Payment Amount | Sloan Health Payment Amount |
|---|---|---|
| 12/19/2022 | $500,000 | $500,000 |
| 12/29/2022 | $1,000,000 | $1,000,000 |
| 1/10/2023 | $500,000 | $500,000 |
| 1/13/2023 | $1,000,000 | $1,000,000 |
| 1/18/2023 | $833,809.84 | $500,000 |
| 3/1/2023 | $1,000,000 | $1,000,000 |
| 3/14/2023 | $500,000 | $500,000 |
| 6/7/2023 | $750,000 | $750,000 |
| 6/28/2023 | $1,000,000 | $1,000,000 |
| 8/1/2023 | $1,000,000 | $1,000,000 |
| 9/8/2023 | $100,000 | $100,000 |
| 9/15/2023 | $100,000 | $100,000 |
| 9/21/2023 | $100,000 | $100,000 |
| 9/27/2023 | $150,000 | $150,000 |
| 10/18/2023 | $200,000 | $200,000 |
| 11/1/2023 | $250,000 | $250,000 |
| 11/22/2023 | $250,000 | $250,000 |
| 12/13/2023 | $300,000 | $300,000 |
| 12/21/2023 | $200,000 | $200,000 |
| 12/29/2023 | $900,000 | $900,000 |
| *Total:* | **$10,633,809.84** | **$10,300,000** |

28.     Because the Legion Media Entities and Sloan Health have operated as a common enterprise or partnership since at least December 2022, each of them is liable for the acts and practices alleged below with regard to the sale of purported diet and cosmetic products sold through undisclosed continuity programs.

12

## COMMERCE

29.   At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES
### Defendants' Unauthorized Billing Scam

30.   The Legion Media Defendants market and sell on the Internet CBD, diet, and skin care products.  These products are and have been sold by Defendant KP Commerce under various brand names, including Ace Keto, Algave Keto, Apex Keto, Bliss Skin Tag Remover, Botanical Farms, Choice Keto, Keto Lux, Optimal Max Keto, Premium Blast Keto, Pro Burn CBD, Proper CBD, Regen CBD, Remedy Skin Tag Remover, Rejuvenate CBD, Slim DNA Keto Spectrum CBD, Supreme CBD, Truly Keto, Truth CBD, Ultimate Keto, Ultra CBD, and Vista Keto.

31.   The Legion Media Defendants also market and sell eBooks or memberships for online access to purported health and wellness resources. These products are and have been sold by Defendant Pinnacle Payments under various brand names, including Challenge Body Mind and Top Trend Products.

32.   The Sloan Health Defendants handle the shipment and large volume of customer returns of the products sold by Defendant KP Commerce.

13

The Sloan Health Defendants help the Legion Media Defendants conceal their identities from consumers by including only a generic name "Fulfillment Center" and a post office box address on the packaging slips and shipping labels.

33.     The Legion Media Defendants obtain consumers' credit or debit card information by enticing them to purchase products offered online by KP Commerce on websites that purport to offer free supplies and a money back guarantee.  These websites include the following URLs: BuyBlissBrands.com/v1; BuyBlissBrands.com/v3; BuyBotanicalFarms.com/v2; and BuyKluxeBrands.com/v1.

34.     However, the Legion Media Defendants deceive consumers about the actual cost of the products and do not adequately disclose, if at all, to consumers that if they order these products then they will be enrolled automatically into a continuity program with recurring shipments and recurring charges.  In addition, the Legion Media Defendants fail to disclose to consumers that they will also be automatically enrolled into membership programs sold by Pinnacle Payments with recurring charges.

35.     The Legion Media Defendants pay affiliate networks to promote their products online, including through advertisements on Facebook.  Some of these advertisements claim the products have been used or sponsored by various celebrities or were featured on the television show "Shark Tank."

14

36.     For example, the following advertisement for the Legion Media Defendants' purported weight loss pill, Luxe Keto + ACE Gummies, claims "Weight Loss Pill That Naturally Burns Fat Gets Biggest Deal in Shark Tank History," and contains a link to "GET YOUR BOTTLE!"



37.     After consumers click on links in advertisements for the Legion Media Defendants' products, they are transferred to webpages on the Legion Media Defendants' websites called "landing pages." Landing pages typically include windows for consumers to enter their contact information. Once consumers enter their contact information, they are transferred to other webpages called "order pages," where they are directed to enter their payment information. The manipulative designs (sometimes called dark patterns) used by the Legion Media Defendants on these webpages include creating pressure to buy immediately by falsely saying inventory is low and

hiding any reference to an automatic enrollment into a continuity program behind a nondescript hyperlink or pre-checked box.

38. For example, the following landing page for the Legion Media Defendants' purported skin tag remover product, Bliss Skin, states on top "Get My Free Bottle!" and promises consumers a "limited supply" of "free bottles" if they click on the link to "ORDER NOW".



39. These landing pages fail to clearly and conspicuously disclose, if at all, information explaining the terms of the consumers' automatic enrollment in continuity programs with recurring charges. For example, Defendants automatically enroll consumers who proceed from the landing page of the Bliss Skin website into continuity programs in which the Legion Media Defendants send them additional products each month and charge their credit cards until the consumer is able to cancel the subscriptions.

40.    The only reference to an "Auto-Ship Program" or "Negative Option" is buried in a separate text box that appears if the consumer scrolls down several screen page lengths to the bottom of the landing page and clicks on a "Terms" link, appearing in very small font.  The following references to "Trial Offer Terms / Auto Ship-Program" and "Negative Option Clause," which list $0 as the amount for "S&H" and $0 for recurring product costs, appear only after scrolling down in the text box:

> **Trial Offer Terms/Auto-Ship Program**
>
> **By placing your trial order today you'll be shipped a 30 day supply of Bliss Skin for $0.00 S&H. All products ship within 1 business day and deliver within 2-4 days from shipment.** Try it for 14 days (10 day trial plus 4 days added for transit time) to experience the benefits and if for any reason our product is not for you, you may call our Customer Care toll-free at (888) 541-2259 within your 14 day trial period to cancel. If you are satisfied, do nothing and you agree to be charged $0.00. Plus you agree to be enrolled in our Bliss Skin Preferred Membership Program and approximately 30 days from your initial order date and every 30 days thereafter, you will receive a fresh supply of Bliss Skin for $0.00 (plus $0.00 shipping and handling). You may cancel your enrollment by calling (888) 541-2259 for customer serivce. Limit 1 trial bottle per household
>
> **Negative Option Clause**
> THIS CONSUMER TRANSACTION INVOLVES A NEGATIVE OPTION, AND THAT YOU MAY BE LIABLE FOR PAYMENT OF FUTURE GOODS AND SERVICES UNDER THE TERMS OF THIS AGREEMENT FOR $0.00 PER MONTH IF YOU FAIL TO NOTIFY THE SUPPLIER NOT TO SUPPLY THE GOODS OR SERVICES DESCRIBED.

41.    Numerous order pages for the Legion Media Defendants' products, where consumers enter their payment information, also fail to clearly and conspicuously disclose, if at all, information explaining the terms of a trial offer or their automatic enrollment in continuity programs with

recurring charges.

     42.    For example, after clicking the "RUSH MY ORDER!" button on the Bliss Skin landing page, consumers are directed to an order page on the Bliss Skin website. The order page continues to promote the urgency of ordering the product quickly, as it states there is a "[l]imited supply available" and the "Sell-Out Risk" is "High." There are no visible disclosures about the terms of a trial offer. Again, only by clicking on a "Terms" link buried at the bottom and scrolling down in a separate text box could consumers find any reference to an auto-ship program.

     43.    By contrast, the Bliss Skin order page prominently (and deceptively) promises a "60-DAY MONEY BACK GUARANTEE" if consumers are not "fully satisfied with our products" beneath three offers of bonus free products ("BUY 3 GET 2 FREE," "BUY 2 GET 1 FREE," and "BUY 1 GET 1 FREE"). Below the window for consumers to enter their payment information and the "RUSH MY ORDER" button, in small print, the Legion Media Defendants include a pre-checked box to "Please enroll me in Challenge Body Mind!" Although the order page provides no information describing what the Challenge Body Mind enrollment refers to, this prechecked box automatically enrolls consumers into a second continuity program with recurring charges for an add-on product related to memberships to health and wellness eBooks that the Legion Media

18

Defendants sell through Pinnacle Payments under the Challenge Body Mind
brand name:



44.     In numerous instances, consumers are not able to review their
final order and total charges during the online checkout process.  After

19

consumers place orders of the Legion Media Defendants' products, they do not receive any email confirmation or other communication notifying them they have been enrolled in an auto-ship or subscription program of any products.

45. Consumers who enter their credit or debit card information online to purchase the Legion Media Defendants' products also incur unauthorized charges because they are charged much higher prices than advertised and/or charged for products they never ordered at all.

46. Consumers do not receive "free" bottles as advertised on the Legion Media Defendants' webpages. Instead, the Legion Media Defendants charge consumers the advertised per bottle amount for all the bottles they ship to consumers. Thus, for example, consumers who select the "Buy 3 Get 2 Free" bottles option at "$39.98/bottle" are charged $39.98 for all five bottles (including the two bottles promoted as "free") for a total charge of approximately $200.

47. Consumers are also enrolled in auto-ship programs, where their debit or credit cards are charged without their consent and they continue to receive shipments of these products each month, until they are able to cancel. Cancellation, as described below, is a difficult process. As a result, consumers incur recurring monthly unauthorized charges, often totaling hundreds of dollars, that are placed on their credit cards or taken out of their

bank accounts.

48.     The Legion Media Defendants also enroll consumers, without their knowledge or consent, into online subscription plans to health and wellness resources under the brand name Challenge Body Mind sold by Defendant Pinnacle Payments.  Consumers incur recurring monthly unauthorized charges, typically $12.49, until they are able to cancel.  Many consumers only learn of these unauthorized charges when they appear on their bank or credit card statements.

49.     Many consumers attempt to cancel their enrollment in these continuity programs that they never agreed to and obtain refunds of the Legion Media Defendants' unauthorized charges, but they often have difficulty cancelling and obtaining refunds.

50.     The Legion Media Defendants provide no simple mechanism on their order web pages to cancel the subscriptions and stop recurring charges.

51.     Numerous consumers who call the Legion Media Defendants to cancel have a difficult time reaching customer service representatives despite calling several times.  Other consumers report they were disconnected when they called the customer service numbers.

52.     Even if they are able to reach a customer service representative to request cancellation, numerous consumers report that they continued to receive and to be charged for shipments of the Legion Media Defendants'

21

products.

53.    Some consumers ultimately cancel their credit and debit cards to ensure they will not be subjected to additional unauthorized charges.

54.    Consumers also encounter a range of difficulties when they attempt to obtain refunds from the Legion Media Defendants for the unauthorized charges.  Some consumers who request refunds are told they cannot get refunds because their requests were untimely or that they can only get a refund if they return the products unopened and at their own expense.  Some consumers are told they would only receive a partial refund or a discount for the products.  Some consumers who have attempted to return products are nonetheless still not able to obtain refunds.

55.    The Legion Media Defendants instruct consumers who are able to reach a customer service representative and request a refund that they must first return, at their own expense, products they received to a post office box in Smyrna, Tennessee.  The post office box address used by the Legion Media Defendants is storage space at a United States Postal Service facility that is reserved by the Sloan Health Defendants who use a trucking service to transfer large volumes of packages returned by consumers to their warehouse in Tennessee.  This arrangement further helps conceal from consumers the physical locations and identities of the Defendants.

## Legion Media Defendants' Credit Card Laundering Activities

### *Background on Merchant Accounts and*
### *Credit Card Laundering*

56.     In order to accept credit card payments from consumers, a merchant must establish a merchant account with a merchant acquiring bank or "acquirer." A merchant account is a type of account that allows businesses to process consumer purchases by credit or debit cards.

57.     Acquirers enter into contracts with entities known as payment processors that manage the bank's merchant processing program. Payment processors in turn frequently enter into contracts with multiple "independent sales organizations" ("ISOs") to sign up merchant accounts with the acquirer.

58.     The acquirer has access to the credit card associations ("card networks"), such as Mastercard and Visa. The card networks require all participants in their networks, including the acquirers and their registered ISOs, to comply with detailed rules governing the use of the card networks. These rules include screening procedures and underwriting standards for merchants, to ensure that they are legitimate, bona fide businesses, and to screen out merchants engaged in potentially fraudulent or illegal practices. The rules also prohibit credit card laundering, which is the practice of processing credit card transactions through another company's merchant account.

23

59.     Merchants that pose a heightened risk of fraud to the card networks may be subject to closer scrutiny or may be denied merchant accounts.  For example, the ISO or acquirer may be concerned that the merchant is engaged in illegal activity or practices that will generate excessive rates of transactions challenged by consumers ("chargebacks").

60.     Consumers initiate "chargebacks" when they dispute credit card charges by contacting their "issuing bank," which is the bank that issued the credit card to the consumer.  When a consumer successfully disputes the charge, the consumer's issuing bank credits the consumer's credit card for the disputed amount, and then recovers the chargeback amount from the acquirer (the merchant's bank).  The acquirer, in turn, may collect the chargeback amount from the merchant.

61.     In order to detect and prevent illegal, fraudulent, or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs.  These chargeback monitoring programs are designed to flag merchant accounts with excessive chargeback ratios or excessive number of chargebacks.  For example, if a merchant generates excessive levels of chargebacks that exceed the thresholds set under Visa's or Mastercard's chargeback monitoring programs, the merchant is subject to additional monitoring requirements and, in some cases, penalties and termination.

62.     Credit card laundering is commonly used by fraudulent merchants who cannot meet a bank's underwriting criteria or who cannot obtain merchant accounts under their own names (whether because of excessive chargebacks, complaints, or other signs of illegal activity).

63.     Even when fraudulent merchants can qualify for a merchant account, they may engage in laundering as a way to conceal their true identity from consumers, the card networks, and law enforcement agencies.

64.     To conceal their identities, fraudulent merchants frequently create shell companies to act as fronts and apply for merchant accounts. Once the merchant accounts are approved, the fraudulent merchant then launders its own transactions through the shell companies' merchant accounts.

### The Legion Media Defendants Used Shell Entities to Open Merchant Accounts They Managed

65.     Defendants Topiwala and Patel have managed hundreds of merchant accounts set up in the name of shell entities to process payments from consumers in connection with separate business impersonation scams described herein. They used several different payment processors or ISOs, including Humboldt Merchant Services, SignaPay, Paysafe, F1 Payments, and Priority Payments, to open these merchant accounts.

66.     The use of shell entities makes it difficult for consumers to

identify who is behind the transactions placing unauthorized charges on their credit or debit cards and for law enforcement to link the entities to a larger scam.

67.     A number of these merchant accounts, after being used to process transactions charging consumers' credit cards, were shut down by ISOs or payment processing entities for incurring excessive levels of chargebacks or engaging in activities that were suspected or confirmed to be credit card laundering.

68.     Defendant Topiwala controlled the merchant accounts' payment gateways (which collect and transmit consumers' credit card information to the ISO or payment processor) and monitored the sales activity in these merchant accounts. In chat messages with sales agents for one ISO, Topiwala threatened to close over one hundred merchant accounts placed with that ISO if the ISO did not release funds that were being held by the ISO to the shell entities' bank accounts that were linked to the merchant accounts.

69.     Defendant Topiwala also helped create fulfillment contracts that he signed on behalf of a fulfillment center with the shell entities serving as fronts for the merchant accounts.  These contracts were included in applications for merchant accounts for the shell entities.

70.     Defendant Patel also helped prepare materials supporting applications for the merchant accounts set up in the name of shell entities,

26

including making changes to the websites submitted with the merchant account applications.

71.     To help set up so many shell entities, the Legion Media Defendants paid a Nevada entity named Reseller Consultants, Inc. ("Reseller Consultants") to recruit individuals to serve as straw signers on merchant account applications from at least 2021 through 2023. The Department of Justice sued Reseller Consultants and others in December 2023 to "enjoin the ongoing commission of criminal wire fraud and bank fraud and conspiracy to commit those offenses in violation of 18 U.S.C. §§ 1343, 1344, and 1349." *See United States v. CB Surety LLC et al.*, Case No. 2:23-cv-02812-TLN-DB (E.D. Cal. Dec. 1, 2023). In January 2024, the Court in *CB Surety* issued a preliminary injunction, placing Reseller Consultants in a temporary receivership and freezing its assets.

72.     The Legion Media Defendants paid Reseller Consultants based on the amount of funds processed through these merchant accounts. From June 2021 through March 2023, Defendant Pinnacle Payments made payments to Reseller Consultants totaling over $600,000.

73.     The shell entities that the Legion Media Defendants used to obtain merchant accounts often followed a similar naming convention where the shell entity's name consisted of three words, and the first letter of the entity's name was the same as the first letter of the straw signer's first name.

27

74.     Proceeds from transactions processed through these merchant

accounts were deposited into bank accounts set up in the name of the shell

entities.  The Legion Media Defendants then transferred funds out of the

shell entities' bank accounts and into bank accounts they maintained,

including a Pinnacle Payments bank account.

75.     In many instances, funds were electronically withdrawn from

multiple bank accounts for shell entities through electronic checks, or

"eChecks," set up on the same day and deposited into a Pinnacle Payments

bank account.  These payments were recorded as "[m]anagement fees."

76.     The table in Figure 2 identifies some of the merchant accounts

managed by the Legion Media Defendants that were opened at one of the

ISOs, Humboldt Merchant Services, in the names of shell entities that

forwarded funds from consumer transactions to Pinnacle Payments.  Figure 2

also identifies the billing descriptors and the initials of the straw signers

listed on the merchant account applications.

**Figure 2: Legion Media Defendants' Merchant Accounts that Used Shell Entities and Straw Signers**

| Entity Listed On Merchant Account Application | Billing Descriptor(s) | Straw Signer (Initials) on Application | Application Approval Date |
|---|---|---|---|
| Awwmit Ruby Media LLC | AR Media*Brands | A.D. | June 2021 |

| Carran Holdings, LLC | CarranH* | C.C. | March 2021 |
|---|---|---|---|
| Cyade Oak Ventures LLC | CyadeOV*Store CyadeOV*Products | C.R. | July 2021 |
| Desea Abstract Horizon LLC | DeasaAH*OnlineStore; DeasaAH*Products | D.S. | April 2021 |
| Drakona Beaming Gardens LLC | Drakona*Brands Drakona*Online | D.C. | Sept.2021 |
| Dydek Whimsy Gardens LLC | DydekWG*Shop DydekWG*Products | D.B. | June 2021 |
| Dynali Crest Marketing LLC | DMarket*Online DMarket*Products | D.F. | Oct. 2021 |
| Dyona Pine Opals LLC | Orderdpobrandsshop orderdpoproductsshop | D.J. | Nov. 2022 |
| Efrona Bright Makings LLC | EBM Products Shop EBM Products Products | E.V. | Oct. 2022 |
| Egita Peace Media LLC | EPMedia*Shop | E.R. | Oct. 2021 |
| Genevi Colorful Sales LLC | GCSales*Products GCSales*Brands | G.R. | Aug. 2021 |
| Harith Cool Group LLC | HCGroup*Store HCG*Brands | H.S. | Sept. 2021 |
| Jobbie Great Creations LLC | orderjgcproducts.com orderjgcproductsonline | J.N. | Oct. 2021 |
| Kaiana Positive Marketing LLC | KPM Products Shop orderkpmbrandsshop.com | K.N. | Oct. 2022 |
| Keater Jaring Media LLC | KJMedia*Shop KJMedia*Brands | K.F. | Sept. 2021 |
| Kefvie Blush Opals LLC | orderkboproducts.com orderkbobrands.com | K.G. | Sept. 2022 |
| Kuini Avery Ventures LLC | orderkavproducts.com orderkavproductsonline | K.R. | Nov. 2021 |

| Leanka Yate Marketing LLC | LYMKTNG*Brands LYMKTNG*Products | L.H. | July 2021 |
|---|---|---|---|
| Lyhara Hoping Media LLC | LHMedia*Brands LHMedia*Products | L.T. | Sept. 2021 |
| Mehany Jolly Standings LLC | MJSTLLC*Store MJSTLLC*Brands | M.P. | July 2021 |
| Miecca Wodi Standings LLC | ordermwsbrands.com ordermwsonlinestore.com | M.H. | Nov. 2021 |
| Nyarie Grace Creations LLC | NGC Products NGC Products Shop | N.J. | Dec. 2021 |
| Padidas Top Horizons LLC | order-pthstore.com order-pthbrands.com | P.C. | Sept. 2022 |
| Racust Jace Ventures LLC | RJVNTRS*brands RJVNTRS*products | R.B. | July 2021 |
| Raheeni Sweet Crest LLC | Orderrscproductsshop.c | R.G. | Oct. 2022 |
| Rudhir Bendy Dreams LLC | RDBSLLC*Brands RDBSLLC*Shop | R.A. | Aug. 2021 |
| Rynon Scoop Venturing LLC | RSV Brands Online RSV Brands | R.M. | Dec. 2021 |
| Sadalio Hoja Yearnings LLC | ordershybrands.com; ordershyproducts.com | S.S. | Sept. 2022 |
| Schasi Oasis Dreams LLC | SODSLLC*products; SODSLLC*brand | S.H. | Sept. 2021 |
| Teluxe Misted Blooms LLC | ordertmbbrands.com | T.D. | Sept. 2022 |
| Traeson Fam Nights LLC | TFN Products | T.G. | Dec. 2021 |
| Wagerah Tate Media LLC | WTM Brands | W.K. | Dec. 2021 |
| Zolbian Mining Greens LLC | ZMGreen*Brands; ZMGreen*Shop | Z.N. | Aug. 2021 |

77.    The billing descriptor is the name that appears for the

transaction on consumers' bank statements. Consumers have incurred unauthorized charges containing the same "billing descriptors" that are connected to the shell merchant accounts managed by the Legion Media Defendants.

78. Consumers' complaints describe unauthorized charges arising from separate business impersonation scams. In these scams, consumers have received a text or email appearing to be from a recognized business (such as Verizon or ACE Hardware) asking them to complete an online survey or claim a prize, leading the consumer to use their debit or credit card to pay a small shipping fee for a gift they supposedly won (such as ear buds or a drill). In some cases, consumers have incurred unauthorized charges from multiple shell entities whose merchant accounts were managed by the Legion Media Defendants.

79. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission because, among other things:

a. Defendants engaged in their unlawful acts and practices over a period of several years;

b. Defendants earned significant revenues from participating in these unlawful acts and practices; and

     c.    Defendants continue their unlawful acts despite knowledge of numerous complaints.

## VIOLATIONS OF THE FTC ACT

80.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

81.    Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

82.    Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I

### Misrepresenting that Consumers Will Receive Free Products
### (Against all Defendants)

83.    In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of purported diet and cosmetic products, the Defendants have represented, directly or indirectly, expressly or by implication, that consumers will receive "free" products when they purchase one or more products from Defendants.

84.    In fact, in numerous instances in which Defendants have made

32

the representation described in Paragraph 83, consumers do not receive free products when they purchase products from Defendants and are charged for all the products they receive from Defendants.

85.     Therefore, the Defendants' representations as described in Paragraph 83 are false and misleading and constitute a deceptive act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Unfairly Charging Consumers Without Consent

### (Against all Defendants)

86.     In numerous instances, as described in Paragraphs 19 through 55 above, the Defendants have charged consumers without their express informed consent.

87.     The Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

88.     Therefore, the Defendants' acts or practices as described in Paragraph 86 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).

## COUNT III

### Unfairly Injuring Consumers by Engaging
### in Credit Card Laundering

### (Against the Legion Media Defendants)

89.     In numerous instances, as described in Paragraphs 56 through 78 above, the Legion Media Defendants have submitted false or misleading information to obtain and maintain merchant accounts through which they placed charges on consumers' credit and debit card accounts by:

(a)     Falsely representing, directly or through agents acting on their behalf or for their benefit, that the shell companies listed on the applications were the true merchants who were applying for merchant accounts; and/or

(b)     Falsely representing, directly or through agents acting on their behalf or for their benefit, that the individual signers listed as the principal owners on the merchant applications were the bona fide principal owners applying for merchant accounts.

90.     The Legion Media Defendants' acts or practices cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

91.     Therefore, the Legion Media Defendants' acts or practices as described in Paragraph 89 constitute unfair acts or practices in violation of

34

Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).

## COUNT IV

### Misrepresenting Affiliation With Businesses

### (Against the Legion Media Defendants)

92. In numerous instances, as described in Paragraphs 56 through 78 above, in connection with consumer transactions processed through merchant accounts managed by the Legion Media Defendants, the Legion Media Defendants have represented, directly or indirectly, expressly or by implication, that emails and text messages soliciting consumers' financial account information were from well-known businesses, or otherwise affiliated with these businesses.

93. In fact, in numerous instances in which the Legion Media Defendants have made the representations described in Paragraph 92, the emails and text messages soliciting consumers' financial account information were not from well-known businesses or otherwise affiliated with these businesses.

94. Therefore, the Defendants' representations as described in Paragraph 93 are false and misleading and constitute a deceptive act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS'
## CONFIDENCE ACT

95.    In 2010, Congress passed the Restore Online Shoppers'
Confidence Act, 15 U.S.C. §§ 8401-05, which became effective on December
29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is
essential to the growth of online commerce.  To continue its development as a
marketplace, the Internet must provide consumers with clear, accurate
information and give sellers an opportunity to fairly compete with one
another for consumers' business."  Section 2 of ROSCA, 15 U.S.C. § 8401.

96.    Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits
charging consumers for goods or services sold in transactions effected on the
Internet through a negative option feature, as that term is defined in the
FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310(w), unless the
seller: (a) clearly and conspicuously discloses all material terms of the
transaction before obtaining the consumer's billing information; (b) obtains
the consumer's express informed consent before making the charge; and (c)
provides simple mechanisms to stop recurring charges.  *See* 15 U.S.C. § 8403.

97.    The TSR defines a negative option feature as: "in an offer or
agreement to sell or provide any goods or services, a provision under which
the consumer's silence or failure to take an affirmative action to reject goods
or services or to cancel the agreement is interpreted by the seller as

36

acceptance of the offer." 16 C.F.R. § 310.2(w).

98.   As described above, the Defendants advertise and sell their personal care products and membership programs to consumers through a negative option feature as defined by the TSR.  *See* 16 C.F.R. § 310.2(w).

99.   Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404(a), 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V
### Violation of ROSCA — Inadequate Disclosures
### (Against all Defendants)

100.   In numerous instances, in connection with the selling of their products on the Internet through a negative option feature, the Defendants failed to clearly and conspicuously disclose all material terms of the transaction, including the price of the products ordered, the auto-renewal provision, and cancellation requirements, before obtaining the consumer's billing information.

101.   The Defendants' practices as set forth above in Paragraph 100 are violations of Section 4 of ROSCA, 15 U.S.C. § 8403(2), and are therefore violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or deceptive act

or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VI

### Violation of ROSCA — Nonconsensual Enrollment

### (Against all Defendants)

102.　In numerous instances, in connection with the selling of their products on the Internet through a negative option feature, the Defendants failed to obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction.

103.　The Defendants' practices as set forth above in Paragraph 102 are violations of Section 4 of ROSCA, 15 U.S.C. § 8403(2), and are therefore violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VII

### Violation of ROSCA — Failure to Provide Simple Cancellation Mechanism

### (Against all Defendants)

104.　In numerous instances, in connection with the selling of their products on the Internet through a negative option feature, the Defendants failed to provide simple mechanisms for a consumer to stop recurring charges

for products to the consumer's credit card, debit card, bank account, or other financial account.

105.    The Defendants' practices as set forth above in Paragraph 104 are violations of Section 4 of ROSCA, 15 U.S.C. § 8403(2), and are therefore violations of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute an unfair or deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT AND REGULATION E

106.    Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), provides that a "preauthorized" electronic fund transfer from a consumer's account may be "authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made."

107.    Section 903(10) of the EFTA, 15 U.S.C. § 1693a(10), provides that the term "preauthorized electronic fund transfer" means "an electronic fund transfer authorized in advance to recur at substantially regular intervals." Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b) provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer. The person that obtains the authorization shall provide a copy to the consumer."

108. Section 1005.10 of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmt. 5, Supp. I, provides that "[t]he authorization process should evidence the consumer's identity and assent to the authorization." The Official Staff Commentary to Regulation E further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable." 12 C.F.R. § 1005.10(b), cmt. 6, Supp. I.

## COUNT VIII

### Unauthorized Debiting from Consumers' Accounts
### (Against all Defendants)

109. In numerous instances, the Defendants debit consumers' bank accounts on a recurring basis without obtaining a written authorization signed or similarly authenticated from consumers for preauthorized electronic fund transfers from their accounts, thereby violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

110. Further, in numerous instances, the Defendants debit consumers' bank accounts on a recurring basis without providing a copy of a written authorization signed or similarly authenticated by the consumer for preauthorized electronic fund transfers from the consumer's account, thereby

violating Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b).

111. Under Section 918(c) of the EFTA, 15 U.S.C. § 1693o(c), a violation of the EFTA and Regulation E constitutes a violation of the FTC Act.

112. Accordingly, by engaging in violations of the EFTA and Regulation E as alleged in Paragraphs 109 and 110 of this Complaint, the Defendants have engaged in violations of the FTC Act. 15 U.S.C. § 1693o(c).

## CONSUMER INJURY

113. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, ROSCA, and EFTA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, and EFTA;

B.     Grant preliminary injunctive and ancillary relief, including temporary and preliminary injunctions, an order freezing assets, immediate access to Defendants' business premises, and the appointment of a receiver;

C.     Award monetary and other relief within the Court's power to

grant; and

      D.    Award any additional relief as the Court determines to be just

and proper.

                                              Respectfully submitted,

Dated:   June 17, 2024

                                              Darren H. Lubetzky
                                              Vikram Jagadish
                                            Federal Trade Commission
                                            Northeast Regional Office
                                            One Bowling Green, Suite 318
                                            New York, NY 10004
                                            Tel: (212) 607-2829
                                            Email: dlubetzky@ftc.gov
                                          Email: vjagadish@ftc.gov

                                          Attorneys for Plaintiff
                                          FEDERAL TRADE COMMISSION