# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>   Plaintiff,<br><br>     v.<br><br>LEGION MEDIA, LLC, a limited liability company;<br><br>KP COMMERCE, LLC, also doing business as BOTANICAL FARMS, BUY BLISS BRANDS, BUY SUPREME CBD, BUY TRIPLEX BOOST, OPTIMAL MAX, TRULY BOOST KETO, TRULY KETO, TRULY MAX BRANDS, TRULY TOTAL HEALTH, TRULY TOTAL KETO, and TRULY MAX BRANDS, a limited liability company;<br><br>PINNACLE PAYMENTS, LLC, also doing business as CHALLENGE BODY MIND and FITNESS PRO, a limited liability company;<br><br>SLOAN HEALTH PRODUCTS, LLC, a limited liability company;<br><br>HARSHIL TOPIWALA, individually and as an owner and officer of LEGION MEDIA, LLC, KP COMMERCE, LLC and PINNACLE PAYMENTS, LLC;<br><br>KIRTAN PATEL, also known as KITS PATEL, individually and as an owner and officer of KP COMMERCE, LLC and PINNACLE PAYMENTS, LLC; | **Case No.** 8:24-cv-1459-JLB-AAS<br><br>**STIPULATED ORDER FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF AS TO HARSHIL TOPIWALA, LEGION MEDIA, LLC, AND PINNACLE PAYMENTS, LLC** |

> MANINDRA GARG, individually and as a principal and owner of SLOAN HEALTH PRODUCTS, LLC,
>
>   Defendants.

Plaintiff, the Federal Trade Commission ("Commission"), filed its Complaint for Permanent Injunction, Monetary Judgments, and Other Relief ("Complaint"), for a permanent injunction, monetary relief, and other relief in this matter, pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) & 57b. The Commission and Defendants Harshil Topiwala, Legion Media, LLC, and Pinnacle Payments, LLC (collectively, the "Topiwala Defendants") stipulate to the entry of this Stipulated Order for Permanent Injunction, Monetary Relief, and Other Relief as to Harshil Topiwala, Legion Media, LLC, and Pinnacle Payments, LLC ("Order") to resolve all matters in dispute in this action between them.

**THEREFORE, IT IS ORDERED** as follows:

## FINDINGS

1.     This Court has jurisdiction over this matter.

2.     The Complaint charges that Defendants participated in deceptive and unfair acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. §§ 45(a) and (n), Section 4 of ROSCA, 15 U.S.C. § 8403(2), Section 907(a) of the EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, 12 C.F.R. § 1005.10(b) in connection with online unauthorized-

billing.

3.     The Topiwala Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Order.  Only for purposes of this action, the Topiwala Defendants admit the facts necessary to establish jurisdiction.

4.     The Topiwala Defendants waive any claim that they may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agree to bear their own costs and attorney fees.

5.     The Topiwala Defendants waive and release any claims that they may have against the Commission, the Receiver, and their agents that relate to this action.

6.     The Topiwala Defendants and the Commission waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A.     "**Acquirer**" means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system (*e.g.*, Visa, MasterCard, American Express, and Discover) to authorize Merchants to accept, transmit, or process payment by credit card through the

credit card system for money, Products, or anything else of value.

B.     "**Billing Information**" means any data that enables any person to access a customer's account, such as a credit card, checking, savings, share, or similar account, utility bill, mortgage loan account, or debit card.

C.     "**Chargeback**" means a procedure whereby an issuing bank or other financial institution charges all or part of an amount of a credit or debit transaction back to the acquiring or merchant bank.

D.     "**Clear and Conspicuous**" means that a required disclosure is easily noticeable (*i.e.*, difficult to miss) and easily understandable by ordinary consumers, including in all of the following ways:

1.     In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.     A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.      An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.      In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.      On a Product label, the disclosure must be presented on the principal display panel.

6.      The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

7.      The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

8.      The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

9.      When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes members of that group.

E.      "**Covered Product**" means any Covered Skin Care Product, any Covered Weight Loss Product, any cannabidiol-related Product (more

commonly known as CBD), and any other food, drug, dietary supplement, or cosmetic.

F.     "**Covered Skin Care Product**" means any Product promoted for removal of skin tags, wrinkles, moles, warts, or other skin blemishes or lesions.

G.     "**Covered Weight Loss Product**" means any Product promoted for weight loss, fat loss, or reduction in body measurements.

H.     "**Credit Card Laundering**" means:

1.     Presenting or depositing into, or causing or allowing another to present or deposit into, the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant;

2.     Employing, soliciting, or otherwise causing or allowing a Merchant, or an employee, representative, or agent of a Merchant, to present to or deposit into the credit card system for payment, a Credit Card Sales Draft generated by a transaction that is not the result of a credit card transaction between the cardholder and the Merchant; or

3.     Obtaining access to the credit card system through the use of a business relationship or an affiliation with a Merchant, when such

access is not authorized by the Merchant Account agreement or the applicable credit card system.

I.    "**Credit Card Sales Draft**" means any record or evidence of a credit card transaction.

J.    "**Defendants**" means Harshil Topiwala, Kirtan Patel, Manindra Garg, Legion Media, LLC, KP Commerce, LLC, Pinnacle Payments, LLC, and Sloan Health Products, LLC, individually, collectively, or in any combination.

    1.    "**Corporate Defendants**" means Legion Media, LLC, KP Commerce, LLC, Pinnacle Payments, LLC, and Sloan Health Products, LLC, and their successors and assigns.

    2.    "**Individual Defendants**" means Harshil Topiwala, Kirtan Patel, and Manindra Garg.

    3.    "**Topiwala Defendants**" means Harshil Topiwala, Legion Media, LLC, and Pinnacle Payments, LLC.

K.    "**Forced Upsell**" means the automatic bundling of any additional Product with the purchase of a Primary Product, including an Upsell that uses a pre-checked checkbox or a bundled additional Product from which consumers cannot opt out.

L.    "**Merchant**" means any natural person, entity, corporation, partnership, or association of persons who is authorized under a written

contract with an Acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of any Product.

M.     "**Merchant Account**" means an account with an Acquirer that authorizes and allows a Merchant to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of Products or a charitable contribution.

N.     "**Negative Option Feature**" means, in an offer or agreement to sell or provide any Product, a provision under which the consumer's silence or failure to take affirmative action to reject a Product, or to cancel the agreement, is interpreted by the seller or provider as acceptance or continuing acceptance of the offer.

O.     "**Preauthorized Electronic Fund Transfers**" means an electronic fund transfer authorized in advance to recur at substantially regular intervals.

P.     "**Primary Product**" means the chief or principal Product that is the subject of the marketing materials or sales offers.

Q.     "**Product**" means products, goods, or services, and includes online memberships.

R.     "**Receiver**" means Mark J. Bernet, Esq. of Akerman LLP.

S.    "**Receivership Estate**" means all assets managed, held, or maintained by the Receiver in connection with his role as Receiver in this litigation.

T.    "**Upsell**" shall mean any Product that is offered to the consumer at the time the consumer purchases the Primary Product.

## ORDER

## I.    BAN ON NEGATIVE OPTIONS

**IT IS ORDERED** that the Topiwala Defendants are permanently restrained and enjoined from advertising, marketing, promoting, offering for sale, or selling any Product with a Negative Option Feature, whether directly or through an intermediary.

## II.    BAN ON FORCED UPSELLS

**IT IS FURTHER ORDERED** that the Topiwala Defendants are permanently restrained and enjoined from advertising, marketing, promoting, offering for sale, or selling any Product as a Forced Upsell, whether directly or through an intermediary.

## III.    PROHIBITED BUSINESS ACTIVITIES

**IT IS FURTHER ORDERED** that the Topiwala Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the

advertising, marketing, promotion, offering for sale, or sale of any Product, are permanently restrained and enjoined from:

    A.    Before a consumer consents to pay for such Product, failing to disclose, or assisting others in failing to disclose in a Clear and Conspicuous manner all material terms and conditions of any offer, including:

        1.    The total cost or price of the Product(s) as well as the individual cost or price of each Product if more than one Product is being ordered;

        2.    The total number of Products the consumer is ordering;

        3.    The amount, timing, and manner of all fees, charges, or other amounts that a consumer will be charged or billed, including the date of the charge and whether it will be a credit card, debit card, or checking account charge; and

        4.    The mechanism for consumers to stop a charge.

    B.    Before a consumer consents to pay for such Product, failing to disclose, or assisting others in failing to disclose in a Clear and Conspicuous manner all material terms and conditions of any refund or cancellation policy, including:

        1.    The specific steps and means by which such requests must be submitted;

2. The customer service telephone number or numbers that a customer must call to cancel and/or return Products;

3. The email address, web address, or street address to which such requests must be directed;

4. Any mechanism that customers must use to return any Products, including any requirement for specific tracking methods or delivery confirmation for a package;

5. If there is any policy of not making refunds or cancellations, including any requirement that a Product will not be accepted for return or refund unless it is unopened and in re-sellable condition, a statement regarding this policy;

6. Any shipping or restocking fees associated with a refund; and

7. The date by which a customer is required to request a refund.

C. Misrepresenting, or assisting others in misrepresenting, expressly or by implication, any fact material to consumers concerning any Product, such as:

1. That the consumer will not be charged for any Product;

2. That a Product is free, risk free, a bonus, a gift, a trial offer, without cost, or without obligation;

3.      That the consumer can obtain a Product for a processing, service, shipping, handling, or administrative fee with no further obligation;

4.      The purpose(s) for which the consumer's Billing Information will be used;

5.      The amount that a consumer's credit or debit card will be charged and the timing of the charge(s);

6.      The total cost to purchase, receive, or use a Product;

7.      Any material restrictions, limitations or conditions to purchase, receive, or use the Product;

8.      That a transaction has been authorized by a consumer;

9.      That a purchase is offered with a satisfaction guarantee or with a money-back guarantee;

10.     Any material aspect of the nature or terms of a refund, cancellation, exchange, or repurchase policy for the Product;

11.     Any material aspect of the performance, efficacy, nature, or central characteristics of a Product;

12.     That the Product is being offered by a well-known business or by a business that is affiliated with a well-known business;

13.     That any advertisement for a Product is an objective source of information, such as an unaffiliated news report or magazine article; or

14.     That an endorsement is by a bona fide user of the Product and reflects the honest opinions, findings, beliefs, or experience of the endorser.

## IV.   PROHIBITION AGAINST DECEPTIVE CLAIMS, INCLUDING FALSE AND/OR UNSUBSTANTIATED CLAIMS

**IT IS FURTHER ORDERED** that the Topiwala Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the advertising, marketing, promotion, offering for sale, or sale of any Covered Product, are permanently restrained and enjoined from making any representation, expressly or by implication, about the health benefits, performance, efficacy, safety, or side effects of any Covered Product, unless the representation is non-misleading, including that, at the time such representation is made, the Topiwala Defendants possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant scientific

fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

## V. PROHIBITION AGAINST VIOLATION OF THE ELECTRONIC FUND TRANSFER ACT

**IT IS FURTHER ORDERED** that the Topiwala Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any Product are hereby permanently restrained and enjoined from:

A.    Engaging in any recurring debiting of a consumer's account without first obtaining a valid written pre-authorization for a Preauthorized Electronic Fund Transfer from the consumer's account, which pre-authorization is clear and readily understandable, identifiable as a pre-authorization, and reflects the consumer's assent, as required by Section 907(a) of the Electronic Fund Transfer Act, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, as more fully set out in Section 1005.10(b) of the Consumer Financial Protection Bureau's Official Staff Commentary to Regulation E ("Official Staff Commentary to Regulation E"), 12 C.F.R. § 1005.10(b), cmts. 5 and 6, Supp. I;

B.    Engaging in any recurring debiting of a consumer's account without first providing a copy of a valid written pre-authorization to the

consumer for a Preauthorized Electronic Fund Transfer from the consumer's account, which copy is clear and readily understandable, identifiable as a pre-authorization, and reflects the consumer's assent, as required by Section 907(a) of EFTA, 15 U.S.C. § 1693e(a), and Section 1005.10(b) of Regulation E, as more fully set out in Section 1005.10(b) of the Official Staff Commentary to Regulation E, 12 C.F.R. § 1005.10(b), cmts. 5 and 6, Supp. I; and

     C.     Violating any provision of EFTA, 15 U.S.C. §§ 1693-1693r, and Regulation E, 12 C.F.R. Part 1005, a copy of which is attached as Attachment A.

## VI.  PROHIBITIONS RELATED TO MERCHANT ACCOUNTS

**IT IS FURTHER ORDERED** that the Topiwala Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

     A.     Failing to disclose to any bank, payment processor, credit card processor, independent sales organization, third party processor, payment gateway, or other financial institution, upon request, any material fact relating to obtaining a Merchant Account, including, but not limited to, the identity of the owner, manager, director, or officer of an entity applying for or

holding a Merchant Account, and whether such owner, manager, director, or officer:

      1.    Has been or is placed in a Merchant Account monitoring program;

      2.    Has had a Merchant Account terminated by a bank, payment processor, or other financial institution; or

      3.    Has been fined or otherwise disciplined by a bank, payment processor, or other financial institution, in connection with a Merchant Account.

B.    Making, or assisting others in making, directly or by implication, any false or misleading statements or material omissions in order to obtain a Merchant Account or respond to a Chargeback.

C.    Engaging in tactics to avoid any fraud or risk monitoring program established by any financial institution, acquiring bank, or the operators of any payment system, including:

      1.    Using shell companies or nominees (including nominee owners, officers, or managers) to obtain Merchant Accounts;

      2.    Balancing or distributing sales transaction volume or sales transaction activity among multiple Merchant Accounts or merchant billing descriptors; or

      3.    Splitting a single transaction into multiple smaller

transactions.

D.      Causing a sham sales transaction, including microtransactions (sometimes referred to as Value Added Propositions or VAP) or sales transactions by a Merchant to itself.

## VII.  PROHIBITION ON CREDIT CARD LAUNDERING

**IT IS FURTHER ORDERED** that the Topiwala Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with a Merchant Account are permanently restrained and enjoined from Credit Card Laundering.

## VIII. INJUNCTION CONCERNING DATA-PASS AND RELATED PRACTICES

**IT IS FURTHER ORDERED** that the Topiwala Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with the sale of any Product are hereby permanently restrained and enjoined:

A.      From passing, directly or indirectly, Billing Information used to charge a consumer to a subsequent seller for use in the Internet-based sale of any Product;

B.     From charging any consumer in the Internet-based sale of any Product using Billing Information released or otherwise obtained, directly or indirectly, from another seller; or

C.     From violating the Restore Online Shoppers Confidence Act, <u>15 U.S.C. §§ 8401-8405</u>, a copy of which is attached as Attachment B.

## IX.  MONETARY JUDGMENT

**IT IS FUTHER ORDERED** that:

A.     Judgment in the amount of Thirty Million Dollars ($30,000,000) is entered in favor of the Commission against the Topiwala Defendants, jointly and severally, as monetary relief.

B.     The Topiwala Defendants are ordered to pay to the Commission One Million, Four Hundred and Twenty-Five Thousand Dollars ($1,425,000), which, as the Topiwala Defendants stipulate, the Receiver holds in escrow for no purpose other than payment to the Commission.  Such payment must be made within seven (7) days after the entry of this Order by electronic fund transfer in accordance with instructions previously provided by a representative of the Commission.  Upon such payment and all other asset transfers specified in Subsections IX.C. through IX.F., the remainder of the judgment is suspended, subject to the Subsections below.

C.     In partial satisfaction of the monetary judgment set forth above, within seven (7) days after the entry of this Order, the following transfers of

assets shall be made to the Commission by electronic fund transfer in accordance with instructions provided by a representative of the Commission. The Topiwala Defendants relinquish all legal and equitable right, title, control, and interest in these assets and shall take all steps necessary to transfer possession, custody, and control of the following assets to the Commission:

     1.    Vanguard Brokerage Services shall transfer to the Commission all assets held in the account ending in account number 1286 in the name of Harshil Topiwala;

     2.    SSB Bank shall transfer to the Commission all assets held in the account ending in account number 3086 in the name of Harshil Topiwala and Karla Topiwala (formerly known as Karla Williams);

     3.    SSB Bank shall transfer to the Commission all assets held in the account ending in account number 9498 in the name of APN Holdings, LLC;

     4.    SSB Bank shall transfer to the Commission all assets held in the account ending in account number 3896 in the name of New Barbarian Publishing LLC; and

     5.    SSB Bank shall transfer to the Commission all assets held in the account ending in account number 3959 in the name of Reaper Media LLC.

D.      In further satisfaction of the monetary judgment set forth above, within seven (7) days after the entry of this Order, the following transfers of assets shall be made to the Receiver by electronic fund transfer, to the extent not already transferred to the Receiver, and such assets shall be included within the Receivership Estate.  The Topiwala Defendants relinquish all legal and equitable right, title, control, and interest in these assets and shall take all steps necessary to transfer possession, custody, and control of the following assets to the Receiver:

1.      Wise US Inc. shall transfer to the Receiver all assets held in the accounts ending in account numbers 8075 and 8605 in the name of Legion Media, LLC;

2.      PNC Bank shall transfer to the Receiver (a) all assets held in the account ending in account number 4303 in the name of Black Window Group, LLC; (b) all assets held in the account ending in account number 5138 in the name of Larchwood Distribution, LLC; and (c) all assets held in the account ending in account number 4982 in the name of KP Commerce, LLC;

3.      SSB Bank shall transfer to the Receiver (a) all assets held in the account ending in account number 4159 in the name of Black Window Group, LLC; (b) all assets held in the account ending in account number 0611 in the name of HK Distribution, LLC; (c) all

assets held in the account ending in account number 9431 in the name of Legion Media, LLC; and (d) all assets held in the account ending in account number 0421 in the name of Pinnacle Payments, LLC;

4.   The Bank of Tampa shall transfer to the Receiver all assets held in the account ending in account number 6130 in the name of H & M Distribution, LLC;

5.   Truist Bank shall transfer to the Receiver (a) all assets held in the account ending in account number 9366 in the name of Legion Media, LLC; and (b) all assets held in the account ending in account number 9374 in the name of Pinnacle Payments, LLC; and

6.   Pathward Financial, Inc. shall transfer to the Receiver all assets held in the reserve accounts held in the name of or for the benefit of Black Window Group, LLC, KP Commerce, LLC, Larchwood Distribution, LLC, and Pinnacle Payments, LLC.

E.   In further satisfaction of the monetary judgment set forth above, within seven (7) days after the entry of this Order, the Topiwala Defendants must transfer to the Receiver, to the extent not already transferred to the Receiver, a 2024 Richard Mille Tourbillon Aerodyne watch (Item price $1,225,000), including its box and all papers describing its specifications and demonstrating its authenticity.

F.   In further satisfaction of the monetary judgment set forth above,

within fourteen (14) days after the entry of this Order, the Topiwala
Defendants shall cause the transfer to the Receiver, to the extent not already
transferred to the Receiver, unencumbered title to and complete ownership
interest in the Michael Jordan Game Used 1998 Eastern Conference Semi
Finals Jersey and Shorts Game Matched for May 8th, 1998 (Item price
$1,350,000; Product ID 13311396).

      G.    The Receiver shall, within three (3) months from the date of
receipt of the Richard Mille Tourbillon Aerodyne watch and title to the
Michael Jordan Game Used 1998 Eastern Conference Semi Finals Jersey and
Shorts Game Matched for May 8th, 1998 identified in Subsections IX.E. and
IX.F., make all good faith efforts to sell such assets. The Receiver shall
ensure that such assets are appraised and either listed for sale at or above
the appraised fair market value or listed for auction at or above eighty-five
percent of the appraised fair market value, and the proposed sale or auction
price shall be subject to the approval of Plaintiff's counsel, which approval
shall not be unreasonably withheld. If the proposed sale price is less than 67
percent of the appraised value, the proposed sale price shall be subject to
Court approval. Individual Defendant Harshil Topiwala shall assist the
Receiver in the Receiver's sale efforts, as the Receiver reasonably may
request. The Receiver shall, within ten (10) days from the sale of such assets,
transfer all proceeds to the Commission by electronic fund transfer in

accordance with instructions provided by a representative of the Commission.

## X. ADDITIONAL MONETARY PROVISIONS

**IT IS FURTHER ORDERED** that:

A. The Topiwala Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

B. The Topiwala Defendants relinquish dominion and all legal and equitable right, title, and interest in all assets in the Receivership Estate and may not seek the return of any assets.

C. The Topiwala Defendants relinquish dominion and all legal and equitable right, title, and interest in the assets of HK Distribution, LLC, including all inventory and equipment, and shall take all necessary steps to transfer possession, custody, and control of these assets to the Receiver. Upon transfer of these assets to the Receiver, such assets shall be included within the Receivership Estate.

D. The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission, including in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order, such as a nondischargeability complaint in any bankruptcy case.

E. The facts alleged in the Complaint establish all elements

necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, <u>11 U.S.C. § 523(a)(2)(A)</u>, and this Order will have collateral estoppel effect for such purposes.

      F.    Each of the Topiwala Defendants acknowledges that Defendant's Employer Identification Number, Social Security Number, or other Taxpayer Identification Number ("TIN"), including all TINs that the Topiwala Defendants previously provided, may be used by the Commission for reporting and other lawful purposes, including collecting on any delinquent amount arising out of this Order in accordance with <u>31 U.S.C. §7701</u>.

      G.    All money received by the Commission pursuant to this Order may be deposited into a fund administered by the Commission or its designee to be used for consumer relief, such as redress and any attendant expenses for the administration of any redress fund.  If a representative of the Commission decides that direct redress to consumers is wholly or partially impracticable or money remains after such redress is completed, the Commission may apply any remaining money for such related relief (including consumer information remedies) as it determines to be reasonably related to Defendants' practices alleged in the Complaint.  Any money not used for relief is to be deposited to the U.S. Treasury.  The Topiwala Defendants have no right to challenge any actions the Commission or its representatives may take pursuant to this Subsection.

H.    The asset freeze is modified to permit the transfers identified in the section titled Monetary Judgment.  Upon completion of those transfers, the asset freeze is dissolved as to the Topiwala Defendants.  The Topiwala Defendants must fully cooperate with the Commission and the Receiver as to the asset freeze and the receivership.  The Topiwala Defendants must take all steps reasonable or necessary to assist in the transfer of each asset, as identified in the section titled Monetary Judgment.  If requested to execute appropriate documents, such as to liquidate, transfer, or assign any frozen asset, the Topiwala Defendants must execute such documents within 3 days of a written request from a representative of the Commission or the Receiver.

## XI.  CUSTOMER INFORMATION

**IT IS FURTHER ORDERED** that the Topiwala Defendants, their officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, are permanently restrained and enjoined from:

A.    Failing to provide sufficient customer information to enable the Commission to efficiently administer consumer redress.  If a representative of the Commission requests in writing any information related to redress, the Topiwala Defendants must provide it, in the form prescribed by the Commission, within 14 days.

B.      Disclosing, using, or benefitting from customer information, including the name, address, telephone number, email address, social security number, other identifying information, or any data that enables access to a customer's account (including a credit card, bank account, or other financial account), that any Topiwala Defendant obtained prior to entry of this Order in connection with any activity alleged in the Complaint; and

C.      Failing to destroy such customer information in all forms in their possession, custody, or control within 30 days after receipt of written direction to do so from a representative of the Commission.

*Provided, however,* that customer information need not be disposed of, and may be disclosed, to the extent requested by a government agency or required by law, regulation, or court order.

## XII.  COOPERATION WITH THE COMMISSION

**IT IS FURTHER ORDERED** that Individual Defendant Harshil Topiwala must fully cooperate with representatives of the Commission in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint.  Individual Defendant Harshil Topiwala must provide truthful and complete information, evidence, and testimony.  Individual Defendant Harshil Topiwala must appear for interviews, discovery, hearings, trials, and any other proceedings that a Commission representative may reasonably request upon 10 days written

notice, or other reasonable notice, at such places and times as a Commission representative may designate, without the service of a subpoena.

## XIII.  COOPERATION WITH THE RECEIVER

**IT IS FURTHER ORDERED** that Individual Defendant Harshil Topiwala must fully cooperate with and assist the Receiver and his representatives in connection with completing the Receiver's duties set forth in the *Ex Parte* Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, dated June 18, 2024 (ECF No. 17), and in connection with the Receiver's duties hereunder.

## XIV.  RECEIVERSHIP TERMINATION

**IT IS FURTHER ORDERED** that the Receiver must complete all duties related to the Topiwala Defendants within 120 days after entry of this Order, but any party or the Receiver may request that the Court extend that Receiver's term for good cause.

## XV.  ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that the Topiwala Defendants obtain acknowledgments of receipt of this Order:

A.      Each Topiwala Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B.      For 10 years after entry of this Order, Individual Defendant

Harshil Topiwala for any business that he, individually or collectively with any other Defendants, is the majority owner or controls directly or indirectly, and Corporate Defendants Legion Media, LLC and Pinnacle Payments, LLC must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting. Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C.     From each individual or entity to which a Topiwala Defendant delivered a copy of this Order, that Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## XVI.  COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that the Topiwala Defendants make timely submissions to the Commission:

A.     One year after entry of this Order, each Topiwala Defendant must submit a compliance report, sworn under penalty of perjury:

1.     Each Topiwala Defendant must: (a) identify the primary physical, postal, and email address and telephone number, as

designated points of contact, which representatives of the Commission may use to communicate with that Topiwala Defendant; (b) identify all of that Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses; (c) describe the activities of each business, including the Products offered, the means of advertising, marketing, and sales, and the involvement of any other Defendant (which Individual Defendant Harshil Topiwala must describe if he knows or should know due to his own involvement); (d) describe in detail whether and how that Defendant is in compliance with each Section of this Order; and (e) provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

2. Additionally, Individual Defendant Harshil Topiwala must: (a) identify all telephone numbers and all physical, postal, email and Internet addresses, including all residences; (b) identify all business activities, including any business for which he performs services whether as an employee or otherwise and any entity in which he has any ownership interest; and (c) describe in detail his involvement in each such business, including title, role, responsibilities, participation, authority, control, and any ownership.

B. For 15 years after entry of this Order, each Topiwala Defendant

must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

    1.    Each Topiwala Defendant must report any change in: (a) any designated point of contact; or (b) the structure of any Corporate Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

    2.    Additionally, Individual Defendant Harshil Topiwala must report any change in: (a) name, including aliases or fictitious name, or residence address; or (b) title or role in any business activity, including any business for which he performs services whether as an employee or otherwise and any entity in which he has any ownership interest, and identify the name, physical address, and any Internet address of the business or entity.

C.    Each Topiwala Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against such Defendant within 14 days of its filing.

D.    Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with

28 U.S.C. § 1746, such as by concluding: "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.       Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. Topiwala (X240034).

## XVII. RECORDKEEPING

**IT IS FURTHER ORDERED** that the Topiwala Defendants must create certain records for 15 years after entry of the Order, and retain each such record for 5 years. Specifically, Corporate Defendants Legion Media, LLC and Pinnacle Payments, LLC and their successors and assigns, and Individual Defendant Harshil Topiwala for any business that such Defendant, individually or collectively with any other Defendants, is a majority owner or controls directly or indirectly, must create and retain the following records:

A.       Accounting records showing the revenues from all Products sold;

B.     Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's:  name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for termination;

C.     Records of all consumer complaints and refund requests, whether received directly or indirectly, such as through a third party, and any response;

D.     All records necessary to demonstrate full compliance with each provision of this Order, including all submissions to the Commission; and

E.     A copy of each unique advertisement or other marketing material.

## XVIII.  COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring the Topiwala Defendants' compliance with this Order, including any failure to transfer any assets as required by this Order:

A.     Within 14 days of receipt of a written request from a representative of the Commission, each Topiwala Defendant must:  submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying.  The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures

prescribed by <u>Federal Rules of Civil Procedure 29</u>, <u>30</u> (including depositions by remote means), 31, 33, 34, 36, 45, and 69.

B.      For matters concerning this Order, the Commission is authorized to communicate directly with each of the Topiwala Defendants.  The Topiwala Defendants must permit representatives of the Commission to interview any employee or other person affiliated with any Defendant who has agreed to such an interview.  The person interviewed may have counsel present.

C.      The Commission may use all other lawful means, including posing, through its representatives as consumers, suppliers, or other individuals or entities, to the Topiwala Defendants or any individual or entity affiliated with the Topiwala Defendants, without the necessity of identification or prior notice.  Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, <u>15 U.S.C. §§ 49</u>, <u>57b-1</u>.

D.      Upon written request from a representative of the Commission, any consumer reporting agency must furnish consumer reports concerning Individual Defendant Harshil Topiwala, pursuant to Section 604(1) of the Fair Credit Reporting Act, <u>15 U.S.C. §1681b(a)(1)</u>.

## XIX.  RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

**SO ORDERED thi**s 16 th **day of** September **2024.**

_____

**JOHN L. BADALAMENTI**
UNITED STATES DISTRICT JUDGE

**SO STIPULATED AND AGREED:**

**FOR PLAINTIFF:**

**FEDERAL TRADE COMMISSION**

Date: September 6, 2024

Attorneys
Darren H. Lubetzky
Vikram Jagadish
Karen Dahlberg O'Connell
Federal Trade Commission
Northeast Regional Office
One Bowling Green, Suite 318
New York, NY 10004
Tel: (212) 607-2829
Email: dlubetzky@ftc.gov
Email: vjagadish@ftc.gov
Email: koconnell@ftc.gov

**FOR THE TOPIWALA DEFENDANTS:**

_____    Date: ___8/15/24___

Janelly Crespo (FBN 124073)
Eric Forni
David Stier
Austin Brown
DLA Piper
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Phone (617) 406-6040
Fax (617) 406-6140
Janelly.Crespo@us.dlapiper.com
Eric.Forni@us.dlapiper.com
David.Stier@us.dlapiper.com
Austin.Brown@us.dlapiper.com
_Counsel for the Topiwala Defendants_

**THE TOPIWALA DEFENDANTS:**

_____    Date: ___08/15/2024___

HARSHIL TOPIWALA, INDIVIDUALLY
AND AS AN OFFICER OF LEGION MEDIA,
LLC AND PINNACLE PAYMENTS, LLC

---

**15 USC CHAPTER 41, SUBCHAPTER VI: ELECTRONIC FUND TRANSFERS**

**From Title 15—COMMERCE AND TRADE**
    CHAPTER 41—CONSUMER CREDIT PROTECTION

---

SUBCHAPTER VI—ELECTRONIC FUND TRANSFERS

## §1693. Congressional findings and declaration of purpose

### (a) Rights and liabilities undefined

The Congress finds that the use of electronic systems to transfer funds provides the potential for substantial benefits to consumers. However, due to the unique characteristics of such systems, the application of existing consumer protection legislation is unclear, leaving the rights and liabilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined.

### (b) Purposes

It is the purpose of this subchapter to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems. The primary objective of this subchapter, however, is the provision of individual consumer rights.

(Pub. L. 90–321, title IX, §902, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3728; amended Pub. L. 111–203, title X, §1073(a)(1), July 21, 2010, 124 Stat. 2060.)

### Editorial Notes

#### Amendments

**2010**—Subsec. (b). Pub. L. 111–203 inserted "and remittance" after "electronic fund".

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

#### Effective Date

Pub. L. 90–321, title IX, §923, formerly §921, as added by Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3741, renumbered §922, Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751; renumbered §923, Pub. L. 111–203, title X, §1073(a)(3), July 21, 2010, 124 Stat. 2060, provided that: "This title [enacting this subchapter] takes effect upon the expiration of eighteen months from the date of its enactment [Nov. 10, 1978], except that sections 909 and 911 [sections 1693g, 1693i of this title] take effect upon the expiration of ninety days after the date of enactment."

[Pub. L. 111–203, §1073(a)(3), which directed renumbering of section 922 of Pub. L. 90–321 as section 923 effective 1 day after July 21, 2010, was executed after the renumbering of section 921 of Pub. L. 90–321 as section 922 by Pub. L. 111–24, §401(1), effective 15 months after May 22, 2009, to reflect the probable intent of Congress.]

#### Short Title

This subchapter known as the "Electronic Fund Transfer Act", see Short Title note set out under section 1601 of this title.

## §1693a. Definitions

As used in this subchapter—

(1) the term "accepted card or other means of access" means a card, code, or other means of access to a consumer's account for the purpose of initiating electronic fund transfers when the person to whom such card or other means of access was issued has requested and received or has signed or has used, or authorized another to use, such card or other means of access for the purpose of transferring money between accounts or obtaining money, property, labor, or services;

(2) the term "account" means a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan as defined in section 1602(i) [1] of this title), as described in regulations of the Bureau, established primarily for personal, family, or household purposes, but such term does not include an account held by a financial institution pursuant to a bona fide trust agreement;

(4) [2] the term "Board" means the Board of Governors of the Federal Reserve System;

(4) [2] the term "Bureau" means the Bureau of Consumer Financial Protection;

(5) the term "business day" means any day on which the offices of the consumer's financial institution involved in an electronic fund transfer are open to the public for carrying on substantially all of its business functions;

(6) the term "consumer" means a natural person;

(7) the term "electronic fund transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone. Such term does not include—

(A) any check guarantee or authorization service which does not directly result in a debit or credit to a consumer's account: [3]

(B) any transfer of funds, other than those processed by automated clearinghouse, made by a financial institution on behalf of a consumer by means of a service that transfers funds held at either Federal Reserve banks or other depository institutions and which is not designed primarily to transfer funds on behalf of a consumer;

(C) any transaction the primary purpose of which is the purchase or sale of securities or commodities through a broker-dealer registered with or regulated by the Securities and Exchange Commission;

(D) any automatic transfer from a savings account to a demand deposit account pursuant to an agreement between a consumer and a financial institution for the purpose of covering an overdraft or maintaining an agreed upon minimum balance in the consumer's demand deposit account; or

(E) any transfer of funds which is initiated by a telephone conversation between a consumer and an officer or employee of a financial institution which is not pursuant to a prearranged plan and under which periodic or recurring transfers are not contemplated;

as determined under regulations of the Bureau;

(8) the term "electronic terminal" means an electronic device, other than a telephone operated by a consumer, through which a consumer may initiate an electronic fund transfer. Such term includes, but is not limited to, point-of-sale terminals, automated teller machines, and cash dispensing machines;

(9) the term "financial institution" means a State or National bank, a State or Federal savings and loan association, a mutual savings bank, a State or Federal credit union, or any other person who, directly or indirectly, holds an account belonging to a consumer;

(10) the term "preauthorized electronic fund transfer" means an electronic fund transfer authorized in advance to recur at substantially regular intervals;

(11) the term "State" means any State, territory, or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any political subdivision of any of the foregoing; and

(12) the term "unauthorized electronic fund transfer" means an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from which the consumer receives no benefit, but the term does not include any electronic fund transfer (A) initiated by a person other than the consumer who was furnished with the card, code, or other means of access to such consumer's account by such consumer, unless the consumer has notified the financial institution involved that transfers by such other person are no longer authorized, (B) initiated with fraudulent intent by the consumer or any person acting in concert with the consumer, or (C) which constitutes an error committed by a financial institution.

(Pub. L. 90–321, title IX, §903, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3728; amended Pub. L. 111–203, title X, §1084(1), (2), July 21, 2010, 124 Stat. 2081.)

EDITORIAL NOTES

## REFERENCES IN TEXT

Section 1602(i) of this title, referred to in par. (2), was redesignated section 1602(j) of this title by Pub. L. 111–203, title X, §1100A(1)(A), July 21, 2010, 124 Stat. 2107.

## AMENDMENTS

**2010**—Pub. L. 111–203, §1084(1), which directed the substitution of "Bureau" for "Board" wherever appearing, was executed by making the substitution in pars. (2) and (6) but not in par. (3), to reflect the probable intent of Congress.

Par. (3). Pub. L. 111–203, §1084(2)(A), redesignated par. (3) as (4) defining the term "Board".

Par. (4). Pub. L. 111–203, §1084(2)(B), which directed addition of par. (4) defining the term "Bureau" after par. (3), was executed by making the addition after par. (4) defining the term "Board", to reflect the probable intent of Congress.

Pub. L. 111–203, §1084(2)(A), redesignated par. (3) as (4) defining the term "Board". Former par. (4) redesignated (5).

Pars. (5) to (12). Pub. L. 111–203, §1084(2)(A), redesignated pars. (4) to (11) as (5) to (12), respectively.

**STATUTORY NOTES AND RELATED SUBSIDIARIES**

**EFFECTIVE DATE OF 2010 AMENDMENT**

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

[1] *See References in Text note below.*

[2] *So in original. There are two pars. designated "(4)" and no par. (3).*

[3] *So in original. The colon probably should be a semicolon.*

## §1693b. Regulations

**(a) Prescription by the Bureau and the Board**

**(1) In general**

Except as provided in paragraph (2), the Bureau shall prescribe rules to carry out the purposes of this subchapter.

**(2) Authority of the Board**

The Board shall have sole authority to prescribe rules—
   (A) to carry out the purposes of this subchapter with respect to a person described in section 5519(a) of title 12; and
   (B) to carry out the purposes of section 1693o–2 of this title.

In prescribing such regulations, the Board shall:

(1)[1] consult with the other agencies referred to in section 1693o[2] of this title and take into account, and allow for, the continuing evolution of electronic banking services and the technology utilized in such services,

(2)[1] prepare an analysis of economic impact which considers the costs and benefits to financial institutions, consumers, and other users of electronic fund transfers, including the extent to which additional documentation, reports, records, or other paper work would be required, and the effects upon competition in the provision of electronic banking services among large and small financial institutions and the availability of such services to different classes of consumers, particularly low income consumers,

(3)[1] to the extent practicable, the Board shall demonstrate that the consumer protections of the proposed regulations outweigh the compliance costs imposed upon consumers and financial institutions, and

(4)[1] any proposed regulations and accompanying analyses shall be sent promptly to Congress by the Board.

**(b) Issuance of model clauses**

The Bureau shall issue model clauses for optional use by financial institutions to facilitate compliance with the disclosure requirements of section 1693c of this title and to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language. Such model clauses shall be adopted after notice duly given in the Federal Register and opportunity for public comment in accordance with section 553 of title 5. With respect to the disclosures required by section 1693c(a)(3) and (4) of this title, the Bureau shall take account of variations in the services and charges under different electronic fund transfer systems and, as appropriate, shall issue alternative model clauses for disclosure of these differing account terms.

**(c) Criteria; modification of requirements**

Regulations prescribed hereunder may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of electronic fund transfers or remittance transfers, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention

or evasion thereof, or to facilitate compliance therewith. The Bureau shall by regulation modify the requirements imposed by this subchapter on small financial institutions if the Bureau determines that such modifications are necessary to alleviate any undue compliance burden on small financial institutions and such modifications are consistent with the purpose and objective of this subchapter.

**(d) Applicability to service providers other than certain financial institutions**

**(1) In general**

If electronic fund transfer services are made available to consumers by a person other than a financial institution holding a consumer's account, the Bureau shall by regulation assure that the disclosures, protections, responsibilities, and remedies created by this subchapter are made applicable to such persons and services.

**(2) State and local government electronic benefit transfer systems**

**(A) "Electronic benefit transfer system" defined**

In this paragraph, the term "electronic benefit transfer system"—

(i) means a system under which a government agency distributes needs-tested benefits by establishing accounts that may be accessed by recipients electronically, such as through automated teller machines or point-of-sale terminals; and

(ii) does not include employment-related payments, including salaries and pension, retirement, or unemployment benefits established by a Federal, State, or local government agency.

**(B) Exemption generally**

The disclosures, protections, responsibilities, and remedies established under this subchapter, and any regulation prescribed or order issued by the Bureau in accordance with this subchapter, shall not apply to any electronic benefit transfer system established under State or local law or administered by a State or local government.

**(C) Exception for direct deposit into recipient's account**

Subparagraph (B) shall not apply with respect to any electronic funds transfer under an electronic benefit transfer system for a deposit directly into a consumer account held by the recipient of the benefit.

**(D) Rule of construction**

No provision of this paragraph—

(i) affects or alters the protections otherwise applicable with respect to benefits established by any other provision [3] Federal, State, or local law; or

(ii) otherwise supersedes the application of any State or local law.

**(3) Fee disclosures at automated teller machines**

**(A) In general**

The regulations prescribed under paragraph (1) shall require any automated teller machine operator who imposes a fee on any consumer for providing host transfer services to such consumer to provide notice in accordance with subparagraph (B) to the consumer (at the time the service is provided) of—

(i) the fact that a fee is imposed by such operator for providing the service; and

(ii) the amount of any such fee.

**(B) Notice requirement**

The notice required under clauses (i) and (ii) of subparagraph (A) with respect to any fee described in such subparagraph shall appear on the screen of the automated teller machine, or on a paper notice issued from such machine, after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction.

**(C) Prohibition on fees not properly disclosed and explicitly assumed by consumer**

No fee may be imposed by any automated teller machine operator in connection with any electronic fund transfer initiated by a consumer for which a notice is required under subparagraph (A), unless—

(i) the consumer receives such notice in accordance with subparagraph (B); and

(ii) the consumer elects to continue in the manner necessary to effect the transaction after receiving such notice.

**(D) Definitions**

For purposes of this paragraph, the following definitions shall apply:

**(i) Automated teller machine operator**

The term "automated teller machine operator" means any person who—

(I) operates an automated teller machine at which consumers initiate electronic fund transfers; and

(II) is not the financial institution that holds the account of such consumer from which the transfer is made.

**(ii) Electronic fund transfer**

The term "electronic fund transfer" includes a transaction that involves a balance inquiry initiated by a consumer in the same manner as an electronic fund transfer, whether or not the consumer initiates a transfer of funds in the course of the transaction.

### (iii) Host transfer services

The term "host transfer services" means any electronic fund transfer made by an automated teller machine operator in connection with a transaction initiated by a consumer at an automated teller machine operated by such operator.

## (e) Deference

No provision of this subchapter may be construed as altering, limiting, or otherwise affecting the deference that a court affords to—

(1) the Bureau in making determinations regarding the meaning or interpretation of any provision of this subchapter for which the Bureau has authority to prescribe regulations; or

(2) the Board in making determinations regarding the meaning or interpretation of section 1693o–2 of this title.

(Pub. L. 90–321, title IX, §904, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3730; amended Pub. L. 104–193, title VIII, §891, title IX, §907, Aug. 22, 1996, 110 Stat. 2346, 2350; Pub. L. 106–102, title VII, §702, Nov. 12, 1999, 113 Stat. 1463; Pub. L. 111–203, title X, §§1073(a)(2), 1084(1), (3), July 21, 2010, 124 Stat. 2060, 2081; Pub. L. 112–216, §1, Dec. 20, 2012, 126 Stat. 1590.)

EDITORIAL NOTES

## REFERENCES IN TEXT

Section 1693o of this title, referred to in subsec. (a)(1), was in the original "section 917", and was translated as meaning section 918 of Pub. L. 90–321 to reflect the probable intent of Congress and the renumbering of section 917 of Pub. L. 90–321 as section 918 by Pub. L. 111–24, title IV, §401, May 22, 2009, 123 Stat. 1751.

## AMENDMENTS

**2012**—Subsec. (d)(3)(B). Pub. L. 112–216, in subpar. heading, substituted "requirement" for "requirements" and, in text, substituted "The notice required under clauses (i) and (ii)" for

"(i) ON THE MACHINE.—The notice required under clause (i) of subparagraph (A) with respect to any fee described in such subparagraph shall be posted in a prominent and conspicuous location on or at the automated teller machine at which the electronic fund transfer is initiated by the consumer.

"(ii) ON THE SCREEN.—The notice required under clauses (i) and (ii)"

and struck out ", except that during the period beginning on November 12, 1999, and ending on December 31, 2004, this clause shall not apply to any automated teller machine that lacks the technical capability to disclose the notice on the screen or to issue a paper notice after the transaction is initiated and before the consumer is irrevocably committed to completing the transaction" after "completing the transaction".

**2010**—Pub. L. 111–203, §1084(1), substituted "Bureau" for "Board" wherever appearing in subsecs. (b) to (d).

Subsec. (a). Pub. L. 111–203, §1084(3)(A), substituted "Prescription by the Bureau and the Board" for "Prescription by Board" in heading that had been supplied editorially and substituted initial pars. (1) and (2), relating to the Bureau's prescription of rules and authority of the Board, for first sentence of former introductory provisions which read as follows: "The Board shall prescribe regulations to carry out the purposes of this subchapter." Second sentence of former introductory provisions was redesignated as concluding provisions of par. (2) to reflect the probable intent of Congress.

Subsec. (c). Pub. L. 111–203, §1073(a)(2), inserted "or remittance transfers" after "electronic fund transfers".

Subsec. (e). Pub. L. 111–203, §1084(3)(B), added subsec. (e).

**1999**—Subsec. (d)(3). Pub. L. 106–102 added par. (3).

**1996**—Subsec. (d). Pub. L. 104–193, §907, which directed the amendment of subsec. (d), was not executed because of similar amendment by Pub. L. 104–193, §891. See below. Section 907 of Pub. L. 104–193 provided that subsec. (d) was to be amended by inserting subsec. (d) heading, by designating existing provisions as par. (1) and inserting heading, and by adding a new par. (2) reading as follows:

"(2) STATE AND LOCAL GOVERNMENT ELECTRONIC BENEFIT TRANSFER PROGRAMS.—

"(A) EXEMPTION GENERALLY.—The disclosures, protections, responsibilities, and remedies established under this subchapter, and any regulation prescribed or order issued by the Board in accordance with this subchapter, shall not apply to any electronic benefit transfer program established under State or local law or administered by a State or local government.

"(B) Exception for direct deposit into recipient's account.—Subparagraph (A) shall not apply with respect to any electronic funds transfer under an electronic benefit transfer program for deposits directly into a consumer account held by the recipient of the benefit.

"(C) Rule of construction.—No provision of this paragraph may be construed as—

"(i) affecting or altering the protections otherwise applicable with respect to benefits established by Federal, State, or local law; or

"(ii) otherwise superseding the application of any State or local law.

"(D) Electronic benefit transfer program defined.—For purposes of this paragraph, the term 'electronic benefit transfer program'—

"(i) means a program under which a government agency distributes needs-tested benefits by establishing accounts to be accessed by recipients electronically, such as through automated teller machines, or point-of-sale terminals; and

"(ii) does not include employment-related payments, including salaries and pension, retirement, or unemployment benefits established by Federal, State, or local governments."

Pub. L. 104–193, §891, designated existing provisions as par. (1), inserted subsec. heading and par. (2), and substituted "If" for "In the event that".

### Statutory Notes and Related Subsidiaries

## Effective Date of 2010 Amendment

Amendment by section 1073(a)(2) of Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

Amendment by section 1084(1), (3) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

[1] So in original. See 2010 Amendment note below.

[2] See References in Text note below.

[3] So in original. Probably should be followed by "of".

# §1693c. Terms and conditions of transfers

**(a) Disclosures; time; form; contents**

The terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed at the time the consumer contracts for an electronic fund transfer service, in accordance with regulations of the Bureau. Such disclosures shall be in readily understandable language and shall include, to the extent applicable—

(1) the consumer's liability for unauthorized electronic fund transfers and, at the financial institution's option, notice of the advisability of prompt reporting of any loss, theft, or unauthorized use of a card, code, or other means of access;

(2) the telephone number and address of the person or office to be notified in the event the consumer believes than [1] an unauthorized electronic fund transfer has been or may be effected;

(3) the type and nature of electronic fund transfers which the consumer may initiate, including any limitations on the frequency or dollar amount of such transfers, except that the details of such limitations need not be disclosed if their confidentiality is necessary to maintain the security of an electronic fund transfer system, as determined by the Bureau;

(4) any charges for electronic fund transfers or for the right to make such transfers;

(5) the consumer's right to stop payment of a preauthorized electronic fund transfer and the procedure to initiate such a stop payment order;

(6) the consumer's right to receive documentation of electronic fund transfers under section 1693d of this title;

(7) a summary, in a form prescribed by regulations of the Bureau, of the error resolution provisions of section 1693f of this title and the consumer's rights thereunder. The financial institution shall thereafter transmit such summary at least once per calendar year;

(8) the financial institution's liability to the consumer under section 1693h of this title;

(9) under what circumstances the financial institution will in the ordinary course of business disclose information concerning the consumer's account to third persons; and

(10) a notice to the consumer that a fee may be imposed by—

(A) an automated teller machine operator (as defined in section 1693b(d)(3)(D)(i) of this title) if the consumer initiates a transfer from an automated teller machine that is not operated by the person issuing the card or other means of access; and

(B) any national, regional, or local network utilized to effect the transaction.

**(b) Notification of changes to consumer**

A financial institution shall notify a consumer in writing at least twenty-one days prior to the effective date of any change in any term or condition of the consumer's account required to be disclosed under subsection (a) if such change would result in greater cost or liability for such consumer or decreased access to the consumer's account. A financial institution may, however, implement a change in the terms or conditions of an account without prior notice when such change is immediately necessary to maintain or restore the security of an electronic fund transfer system or a consumer's account. Subject to subsection (a)(3), the Bureau shall require subsequent notification if such a change is made permanent.

**(c) Time for disclosures respecting accounts accessible prior to effective date of this subchapter**

For any account of a consumer made accessible to electronic fund transfers prior to the effective date of this subchapter, the information required to be disclosed to the consumer under subsection (a) shall be disclosed not later than the earlier of—

(1) the first periodic statement required by section 1693d(c) of this title after the effective date of this subchapter; or

(2) thirty days after the effective date of this subchapter.

(Pub. L. 90–321, title IX, §905, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3730; amended Pub. L. 106–102, title VII, §703, Nov. 12, 1999, 113 Stat. 1464; Pub. L. 111–203, title X, §1084(1), July 21, 2010, 124 Stat. 2081.)

### Editorial Notes

## References in Text

For effective date of this subchapter, referred to in subsec. (c), see section 921 of Pub. L. 90–321, set out as an Effective Date note under section 1693 of this title.

## Amendments

**2010**—Subsecs. (a), (b). Pub. L. 111–203 substituted "Bureau" for "Board" wherever appearing.
**1999**—Subsec. (a)(10). Pub. L. 106–102 added par. (10).

### Statutory Notes and Related Subsidiaries

## Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

*1 So in original. Probably should be "that".*

# §1693d. Documentation of transfers

**(a) Availability of written documentation to consumer; contents**

For each electronic fund transfer initiated by a consumer from an electronic terminal, the financial institution holding such consumer's account shall, directly or indirectly, at the time the transfer is initiated, make available to the consumer written documentation of such transfer. The documentation shall clearly set forth to the extent applicable—

(1) the amount involved and date the transfer is initiated;

(2) the type of transfer;

(3) the identity of the consumer's account with the financial institution from which or to which funds are transferred;

(4) the identity of any third party to whom or from whom funds are transferred; and

(5) the location or identification of the electronic terminal involved.

**(b) Notice of credit to consumer**

For a consumer's account which is scheduled to be credited by a preauthorized electronic fund transfer from the same payor at least once in each successive sixty-day period, except where the payor provides positive notice of the transfer to the consumer, the financial institution shall elect to provide promptly either positive notice to the consumer when the credit is made as scheduled, or negative notice to the consumer when the credit is not made as scheduled, in

accordance with regulations of the Bureau. The means of notice elected shall be disclosed to the consumer in accordance with section 1693c of this title.

**(c) Periodic statement; contents**

A financial institution shall provide each consumer with a periodic statement for each account of such consumer that may be accessed by means of an electronic fund transfer. Except as provided in subsections (d) and (e), such statement shall be provided at least monthly for each monthly or shorter cycle in which an electronic fund transfer affecting the account has occurred, or every three months, whichever is more frequent. The statement, which may include information regarding transactions other than electronic fund transfers, shall clearly set forth—

(1) with regard to each electronic fund transfer during the period, the information described in subsection (a), which may be provided on an accompanying document;

(2) the amount of any fee or charge assessed by the financial institution during the period for electronic fund transfers or for account maintenance;

(3) the balances in the consumer's account at the beginning of the period and at the close of the period; and

(4) the address and telephone number to be used by the financial institution for the purpose of receiving any statement inquiry or notice of account error from the consumer. Such address and telephone number shall be preceded by the caption "Direct Inquiries To:" or other similar language indicating that the address and number are to be used for such inquiries or notices.

**(d) Consumer passbook accounts**

In the case of a consumer's passbook account which may not be accessed by electronic fund transfers other than preauthorized electronic fund transfers crediting the account, a financial institution may, in lieu of complying with the requirements of subsection (c), upon presentation of the passbook provide the consumer in writing with the amount and date of each such transfer involving the account since the passbook was last presented.

**(e) Accounts other than passbook accounts**

In the case of a consumer's account, other than a passbook account, which may not be accessed by electronic fund transfers other than preauthorized electronic fund transfers crediting the account, the financial institution may provide a periodic statement on a quarterly basis which otherwise complies with the requirements of subsection (c).

**(f) Documentation as evidence**

In any action involving a consumer, any documentation required by this section to be given to the consumer which indicates that an electronic fund transfer was made to another person shall be admissible as evidence of such transfer and shall constitute prima facie proof that such transfer was made.

(Pub. L. 90–321, title IX, §906, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3731; amended Pub. L. 111–203, title X, §1084(1), July 21, 2010, 124 Stat. 2081.)

### Editorial Notes

### Amendments

**2010**—Subsec. (b). Pub. L. 111–203 substituted "Bureau" for "Board".

### Statutory Notes and Related Subsidiaries

### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## §1693e. Preauthorized transfers

(a) A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made. A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer. The financial institution may require written confirmation to be provided to it within fourteen days of an oral notification if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent.

(b) In the case of preauthorized transfers from a consumer's account to the same person which may vary in amount, the financial institution or designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with regulations of the Bureau, of the amount to be transferred and the scheduled date of the transfer.

(Pub. L. 90–321, title IX, §907, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3733; amended Pub. L. 111–203, title X, §1084(1), July 21, 2010, 124 Stat. 2081.)

**Editorial Notes**

**Amendments**

**2010**—Subsec. (b). Pub. L. 111–203 substituted "Bureau" for "Board".

**Statutory Notes and Related Subsidiaries**

**Effective Date of 2010 Amendment**

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## §1693f. Error resolution

### (a) Notification to financial institution of error

If a financial institution, within sixty days after having transmitted to a consumer documentation pursuant to section 1693d(a), (c), or (d) of this title or notification pursuant to section 1693d(b) of this title, receives oral or written notice in which the consumer—

(1) sets forth or otherwise enables the financial institution to identify the name and account number of the consumer;

(2) indicates the consumer's belief that the documentation, or, in the case of notification pursuant to section 1693d(b) of this title, the consumer's account, contains an error and the amount of such error; and

(3) sets forth the reasons for the consumer's belief (where applicable) that an error has occurred,

the financial institution shall investigate the alleged error, determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days. The financial institution may require written confirmation to be provided to it within ten business days of an oral notification of error if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent. A financial institution which requires written confirmation in accordance with the previous sentence need not provisionally recredit a consumer's account in accordance with subsection (c), nor shall the financial institution be liable under subsection (e) if the written confirmation is not received within the ten-day period referred to in the previous sentence.

### (b) Correction of error; interest

If the financial institution determines that an error did occur, it shall promptly, but in no event more than one business day after such determination, correct the error, subject to section 1693g of this title, including the crediting of interest where applicable.

### (c) Provisional recredit of consumer's account

If a financial institution receives notice of an error in the manner and within the time period specified in subsection (a), it may, in lieu of the requirements of subsections (a) and (b), within ten business days after receiving such notice provisionally recredit the consumer's account for the amount alleged to be in error, subject to section 1693g of this title, including interest where applicable, pending the conclusion of its investigation and its determination of whether an error has occurred. Such investigation shall be concluded not later than forty-five days after receipt of notice of the error. During the pendency of the investigation, the consumer shall have full use of the funds provisionally recredited.

### (d) Absence of error; finding; explanation

If the financial institution determines after its investigation pursuant to subsection (a) or (c) that an error did not occur, it shall deliver or mail to the consumer an explanation of its findings within 3 business days after the conclusion of its investigation, and upon request of the consumer promptly deliver or mail to the consumer reproductions of all documents which the financial institution relied on to conclude that such error did not occur. The financial institution shall include notice of the right to request reproductions with the explanation of its findings.

### (e) Treble damages

If in any action under section 1693m [1] of this title, the court finds that—

(1) the financial institution did not provisionally recredit a consumer's account within the ten-day period specified in subsection (c), and the financial institution (A) did not make a good faith investigation of the alleged error, or (B) did not have a reasonable basis for believing that the consumer's account was not in error; or

(2) the financial institution knowingly and willfully concluded that the consumer's account was not in error when such conclusion could not reasonably have been drawn from the evidence available to the financial institution at the time of its investigation,

then the consumer shall be entitled to treble damages determined under section 1693m(a)(1) [1] of this title.

**(f) Acts constituting error**

For the purpose of this section, an error consists of—

(1) an unauthorized electronic fund transfer;

(2) an incorrect electronic fund transfer from or to the consumer's account;

(3) the omission from a periodic statement of an electronic fund transfer affecting the consumer's account which should have been included;

(4) a computational error by the financial institution;

(5) the consumer's receipt of an incorrect amount of money from an electronic terminal;

(6) a consumer's request for additional information or clarification concerning an electronic fund transfer or any documentation required by this subchapter; or

(7) any other error described in regulations of the Bureau.

(Pub. L. 90–321, title IX, §908, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3733; amended Pub. L. 111–203, title X, §1084(1), July 21, 2010, 124 Stat. 2081.)

### Editorial Notes

## References in Text

Section 1693m of this title, referred to in subsec. (e), was in the original a reference to section 915 of Pub. L. 90–321, and was translated as meaning section 916 of Pub. L. 90–321 to reflect the probable intent of Congress and the renumbering of section 915 of Pub. L. 90–321 as section 916 by Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751.

## Amendments

**2010**—Subsec. (f)(7). Pub. L. 111–203 substituted "Bureau" for "Board".

### Statutory Notes and Related Subsidiaries

## Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

[1] See References in Text note below.

# §1693g. Consumer liability

**(a) Unauthorized electronic fund transfers; limit**

A consumer shall be liable for any unauthorized electronic fund transfer involving the account of such consumer only if the card or other means of access utilized for such transfer was an accepted card or other meanas [1] of access and if the issuer of such card, code, or other means of access has provided a means whereby the user of such card, code, or other means of access can be identified as the person authorized to use it, such as by signature, photograph, or fingerprint or by electronic or mechanical confirmation. In no event, however, shall a consumer's liability for an unauthorized transfer exceed the lesser of—

(1) $50; or

(2) the amount of money or value of property or services obtained in such unauthorized electronic fund transfer prior to the time the financial institution is notified of, or otherwise becomes aware of, circumstances which lead to the reasonable belief that an unauthorized electronic fund transfer involving the consumer's account has been or may be effected. Notice under this paragraph is sufficient when such steps have been taken as may be reasonably required in the ordinary course of business to provide the financial institution with the pertinent information, whether or not any particular officer, employee, or agent of the financial institution does in fact receive such information.

Notwithstanding the foregoing, reimbursement need not be made to the consumer for losses the financial institution establishes would not have occurred but for the failure of the consumer to report within sixty days of transmittal of the statement (or in extenuating circumstances such as extended travel or hospitalization, within a reasonable time under the circumstances) any unauthorized electronic fund transfer or account error which appears on the periodic statement provided to the consumer under section 1693d of this title. In addition, reimbursement need not be made to the consumer for losses which the financial institution establishes would not have occurred but for the failure of the consumer to report any loss or theft of a card or other means of access within two business days after the consumer

learns of the loss or theft (or in extenuating circumstances such as extended travel or hospitalization, within a longer period which is reasonable under the circumstances), but the consumer's liability under this subsection in any such case may not exceed a total of $500, or the amount of unauthorized electronic fund transfers which occur following the close of two business days (or such longer period) after the consumer learns of the loss or theft but prior to notice to the financial institution under this subsection, whichever is less.

**(b) Burden of proof**

In any action which involves a consumer's liability for an unauthorized electronic fund transfer, the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized or, if the electronic fund transfer was unauthorized, then the burden of proof is upon the financial institution to establish that the conditions of liability set forth in subsection (a) have been met, and, if the transfer was initiated after the effective date of section 1693c of this title, that the disclosures required to be made to the consumer under section 1693c(a)(1) and (2) of this title were in fact made in accordance with such section.

**(c) Determination of limitation on liability**

In the event of a transaction which involves both an unauthorized electronic fund transfer and an extension of credit as defined in section 1602(e) [2] of this title pursuant to an agreement between the consumer and the financial institution to extend such credit to the consumer in the event the consumer's account is overdrawn, the limitation on the consumer's liability for such transaction shall be determined solely in accordance with this section.

**(d) Restriction on liability**

Nothing in this section imposes liability upon a consumer for an unauthorized electronic fund transfer in excess of his liability for such a transfer under other applicable law or under any agreement with the consumer's financial institution.

**(e) Scope of liability**

Except as provided in this section, a consumer incurs no liability from an unauthorized electronic fund transfer.

(Pub. L. 90–321, title IX, §909, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3734.)

### Editorial Notes

## References in Text

Section 1602(e) of this title, referred to in subsec. (c), was redesignated section 1602(f) of this title by Pub. L. 111–203, title X, §1100A(1)(A), July 21, 2010, 124 Stat. 2107.

[1] So in original. Probably should be "means".

[2] See References in Text note below.

# §1693h. Liability of financial institutions

**(a) Action or failure to act proximately causing damages**

Subject to subsections (b) and (c), a financial institution shall be liable to a consumer for all damages proximately caused by—

(1) the financial institution's failure to make an electronic fund transfer, in accordance with the terms and conditions of an account, in the correct amount or in a timely manner when properly instructed to do so by the consumer, except where—

(A) the consumer's account has insufficient funds;

(B) the funds are subject to legal process or other encumbrance restricting such transfer;

(C) such transfer would exceed an established credit limit;

(D) an electronic terminal has insufficient cash to complete the transaction; or

(E) as otherwise provided in regulations of the Bureau.

(2) the financial institution's failure to make an electronic fund transfer due to insufficient funds when the financal [1] institution failed to credit, in accordance with the terms and conditions of an account, a deposit of funds to the consumer's account which would have provided sufficient funds to make the transfer, and

(3) the financial institution's failure to stop payment of a preauthorized transfer from a consumer's account when instructed to do so in accordance with the terms and conditions of the account.

**(b) Acts of God and technical malfunctions**

A financial institution shall not be liable under subsection (a)(1) or (2) if the financial institution shows by a preponderance of the evidence that its action or failure to act resulted from—

(1) an act of God or other circumstance beyond its control, that it exercised reasonable care to prevent such an occurrence, and that it exercised such diligence as the circumstances required; or

(2) a technical malfunction which was known to the consumer at the time he attempted to initiate an electronic fund transfer or, in the case of a preauthorized transfer, at the time such transfer should have occurred.

### (c) Intent

In the case of a failure described in subsection (a) which was not intentional and which resulted from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid any such error, the financial institution shall be liable for actual damages proved.

### (d) Exception for damaged notices

If the notice required to be posted pursuant to section 1693b(d)(3)(B)(i) of this title by an automated teller machine operator has been posted by such operator in compliance with such section and the notice is subsequently removed, damaged, or altered by any person other than the operator of the automated teller machine, the operator shall have no liability under this section for failure to comply with section 1693b(d)(3)(B)(i) of this title.

(Pub. L. 90–321, title IX, §910, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3735; amended Pub. L. 106–102, title VII, §705, Nov. 12, 1999, 113 Stat. 1465; Pub. L. 111–203, title X, §1084(1), July 21, 2010, 124 Stat. 2081.)

#### Editorial Notes

#### Amendments

**2010**—Subsec. (a)(1)(E). Pub. L. 111–203 substituted "Bureau" for "Board".
**1999**—Subsec. (d). Pub. L. 106–102 added subsec. (d).

#### Statutory Notes and Related Subsidiaries

#### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

[1] So in original. Probably should be "financial".

# §1693i. Issuance of cards or other means of access

### (a) Prohibition; proper issuance

No person may issue to a consumer any card, code, or other means of access to such consumer's account for the purpose of initiating an electronic fund transfer other than—

(1) in response to a request or application therefor; or

(2) as a renewal of, or in substitution for, an accepted card, code, or other means of access, whether issued by the initial issuer or a successor.

### (b) Exceptions

Notwithstanding the provisions of subsection (a), a person may distribute to a consumer on an unsolicited basis a card, code, or other means of access for use in initiating an electronic fund transfer from such consumer's account, if—

(1) such card, code, or other means of access is not validated;

(2) such distribution is accompanied by a complete disclosure, in accordance with section 1693c of this title, of the consumer's rights and liabilities which will apply if such card, code, or other means of access is validated;

(3) such distribution is accompanied by a clear explanation, in accordance with regulations of the Bureau, that such card, code, or other means of access is not validated and how the consumer may dispose of such code, card, or other means of access if validation is not desired; and

(4) such card, code, or other means of access is validated only in response to a request or application from the consumer, upon verification of the consumer's identity.

### (c) Validation

For the purpose of subsection (b), a card, code, or other means of access is validated when it may be used to initiate an electronic fund transfer.

(Pub. L. 90–321, title IX, §911, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3736; amended Pub. L. 111–203, title X, §1084(1), July 21, 2010, 124 Stat. 2081.)

EDITORIAL NOTES

## AMENDMENTS

**2010**—Subsec. (b)(3). Pub. L. 111–203 substituted "Bureau" for "Board".

STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## §1693j. Suspension of obligations

If a system malfunction prevents the effectuation of an electronic fund transfer initiated by a consumer to another person, and such other person has agreed to accept payment by such means, the consumer's obligation to the other person shall be suspended until the malfunction is corrected and the electronic fund transfer may be completed, unless such other person has subsequently, by written request, demanded payment by means other than an electronic fund transfer.

(Pub. L. 90–321, title IX, §912, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3737.)

## §1693k. Compulsory use of electronic fund transfers

No person may—
   (1) condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers; or
   (2) require a consumer to establish an account for receipt of electronic fund transfers with a particular financial institution as a condition of employment or receipt of a government benefit.

(Pub. L. 90–321, title IX, §913, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3737.)

## §1693*l*. Waiver of rights

No writing or other agreement between a consumer and any other person may contain any provision which constitutes a waiver of any right conferred or cause of action created by this subchapter. Nothing in this section prohibits, however, any writing or other agreement which grants to a consumer a more extensive right or remedy or greater protection than contained in this subchapter or a waiver given in settlement of a dispute or action.

(Pub. L. 90–321, title IX, §914, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3737.)

## §1693*l*–1. General-use prepaid cards, gift certificates, and store gift cards

**(a) Definitions**

In this section, the following definitions shall apply:

**(1) Dormancy fee; inactivity charge or fee**

The terms "dormancy fee" and "inactivity charge or fee" mean a fee, charge, or penalty for non-use or inactivity of a gift certificate, store gift card, or general-use prepaid card.

**(2) General use [1] prepaid card, gift certificate, and store gift card**

  **(A) General-use prepaid card**

    The term "general-use prepaid card" means a card or other payment code or device issued by any person that is—
      (i) redeemable at multiple, unaffiliated merchants or service providers, or automated teller machines;
      (ii) issued in a requested amount, whether or not that amount may, at the option of the issuer, be increased in value or reloaded if requested by the holder;
      (iii) purchased or loaded on a prepaid basis; and
      (iv) honored, upon presentation, by merchants for goods or services, or at automated teller machines.

  **(B) Gift certificate**

    The term "gift certificate" means an electronic promise that is—

(i) redeemable at a single merchant or an affiliated group of merchants that share the same name, mark, or logo;

(ii) issued in a specified amount that may not be increased or reloaded;

(iii) purchased on a prepaid basis in exchange for payment; and

(iv) honored upon presentation by such single merchant or affiliated group of merchants for goods or services.

**(C) Store gift card**

The term "store gift card" means an electronic promise, plastic card, or other payment code or device that is—

(i) redeemable at a single merchant or an affiliated group of merchants that share the same name, mark, or logo;

(ii) issued in a specified amount, whether or not that amount may be increased in value or reloaded at the request of the holder;

(iii) purchased on a prepaid basis in exchange for payment; and

(iv) honored upon presentation by such single merchant or affiliated group of merchants for goods or services.

**(D) Exclusions**

The terms "general-use prepaid card", "gift certificate", and "store gift card" do not include an electronic promise, plastic card, or payment code or device that is—

(i) used solely for telephone services;

(ii) reloadable and not marketed or labeled as a gift card or gift certificate;

(iii) a loyalty, award, or promotional gift card, as defined by the Bureau;

(iv) not marketed to the general public;

(v) issued in paper form only (including for tickets and events); or

(vi) redeemable solely for admission to events or venues at a particular location or group of affiliated locations, which may also include services or goods obtainable—

(I) at the event or venue after admission; or

(II) in conjunction with admission to such events or venues, at specific locations affiliated with and in geographic proximity to the event or venue.

**(3) Service fee**

**(A) In general**

The term "service fee" means a periodic fee, charge, or penalty for holding or use of a gift certificate, store gift card, or general-use prepaid card.

**(B) Exclusion**

With respect to a general-use prepaid card, the term "service fee" does not include a one-time initial issuance fee.

**(b) Prohibition on imposition of fees or charges**

**(1) In general**

Except as provided under paragraphs (2) through (4), it shall be unlawful for any person to impose a dormancy fee, an inactivity charge or fee, or a service fee with respect to a gift certificate, store gift card, or general-use prepaid card.

**(2) Exceptions**

A dormancy fee, inactivity charge or fee, or service fee may be charged with respect to a gift certificate, store gift card, or general-use prepaid card, if—

(A) there has been no activity with respect to the certificate or card in the 12-month period ending on the date on which the charge or fee is imposed;

(B) the disclosure requirements of paragraph (3) have been met;

(C) not more than one fee may be charged in any given month; and

(D) any additional requirements that the Bureau may establish through rulemaking under subsection (d) have been met.

**(3) Disclosure requirements**

The disclosure requirements of this paragraph are met if—

(A) the gift certificate, store gift card, or general-use prepaid card clearly and conspicuously states—

(i) that a dormancy fee, inactivity charge or fee, or service fee may be charged;

(ii) the amount of such fee or charge;

(iii) how often such fee or charge may be assessed; and

(iv) that such fee or charge may be assessed for inactivity; and

(B) the issuer or vendor of such certificate or card informs the purchaser of such charge or fee before such certificate or card is purchased, regardless of whether the certificate or card is purchased in person, over the Internet, or by telephone.

**(4) Exclusion**

The prohibition under paragraph (1) shall not apply to any gift certificate—

 (A) that is distributed pursuant to an award, loyalty, or promotional program, as defined by the Bureau; and

 (B) with respect to which, there is no money or other value exchanged.

### (c) Prohibition on sale of gift cards with expiration dates

#### (1) In general

Except as provided under paragraph (2), it shall be unlawful for any person to sell or issue a gift certificate, store gift card, or general-use prepaid card that is subject to an expiration date.

#### (2) Exceptions

A gift certificate, store gift card, or general-use prepaid card may contain an expiration date if—

 (A) the expiration date is not earlier than 5 years after the date on which the gift certificate was issued, or the date on which card funds were last loaded to a store gift card or general-use prepaid card; and

 (B) the terms of expiration are clearly and conspicuously stated.

### (d) Additional rulemaking

#### (1) In general

The Bureau shall—

 (A) prescribe regulations to carry out this section, in addition to any other rules or regulations required by this subchapter, including such additional requirements as appropriate relating to the amount of dormancy fees, inactivity charges or fees, or service fees that may be assessed and the amount of remaining value of a gift certificate, store gift card, or general-use prepaid card below which such charges or fees may be assessed; and

 (B) shall [2] determine the extent to which the individual definitions and provisions of this subchapter or Regulation E should apply to general-use prepaid cards, gift certificates, and store gift cards.

#### (2) Consultation

In prescribing regulations under this subsection, the Bureau shall consult with the Federal Trade Commission.

#### (3) Timing; effective date

The regulations required by this subsection shall be issued in final form not later than 9 months after May 22, 2009.

(Pub. L. 90–321, title IX, §915, as added Pub. L. 111–24, title IV, §401(2), May 22, 2009, 123 Stat. 1751; amended Pub. L. 111–203, title X, §1084(1), July 21, 2010, 124 Stat. 2081.)

---

**EDITORIAL NOTES**

## PRIOR PROVISIONS

A prior section 915 of Pub. L. 90–321 was renumbered section 916 and is classified to section 1693m of this title.

## AMENDMENTS

**2010**—Pub. L. 111–203 substituted "Bureau" for "Board" wherever appearing.

**STATUTORY NOTES AND RELATED SUBSIDIARIES**

## EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## EFFECTIVE DATE

Pub. L. 111–24, title IV, §403, as added by Pub. L. 111–209, §1, July 27, 2010, 124 Stat. 2254, provided that:

"(a) IN GENERAL.—Except as provided under subsection (b) of this section, this title [enacting this section and amending sections 1693m to 1693r of this title and provisions set out as a note under section 1693 of this title] and the amendments made by this title shall become effective 15 months after the date of enactment of this Act [May 22, 2009].

"(b) EXCEPTION.—

 "(1) IN GENERAL.—In the case of a gift certificate, store gift card, or general-use prepaid card that was produced prior to April 1, 2010, the effective date of the disclosure requirements described in sections 915(b)(3) and (c)(2)(B) of the Electronic Funds [probably should be "Fund"] Transfer Act [15 U.S.C. 1693l–1(b)(3), (c)(2)(B)] shall be January 31, 2011, provided that an issuer of such a certificate or card shall—

"(A) comply with paragraphs (1) and (2) of section 915(b) of such Act [15 U.S.C. 1693l–1(b)(1), (2)];

"(B) consider any such certificate or card for which funds expire to have no expiration date with respect to the underlying funds;

"(C) at a consumer's request, replace such certificate or card that has funds remaining at no cost to the consumer; and

"(D) comply with the disclosure requirements of paragraph (2) of this subsection.

"(2) DISCLOSURE REQUIREMENTS.—The disclosure requirements of this subsection are met by providing notice to consumers, via in-store signage, messages during customer service calls, Web sites, and general advertising, that—

"(A) any such certificate or card for which funds expire shall be deemed to have no expiration date with respect to the underlying funds;

"(B) consumers holding such certificate or card shall have a right to a free replacement certificate or card that includes the packaging and materials, typically associated with such a certificate or card; and

"(C) any dormancy fee, inactivity fee, or service fee for such certificates or cards that might otherwise be charged shall not be charged if such fees do not comply with section 915 of the Electronic Fund [probably should be "Fund"] Transfer Act [15 U.S.C. 1693l–1].

"(3) PERIOD FOR DISCLOSURE REQUIREMENTS.—The notice requirements in paragraph (2) of this subsection shall continue until January 31, 2013."

Pub. L. 111–24, title IV, §403, May 22, 2009, 123 Stat. 1754, which provided that title IV of Pub. L. 111–24 was to become effective 15 months after May 22, 2009, was repealed by Pub. L. 111–209, §1, July 27, 2010, 124 Stat. 2254.

---

[1] So in original. Probably should be "General-use".

[2] So in original. The word "shall" probably should not appear.

---

# §1693m. Civil liability

**(a) Individual or class action for damages; amount of award**

Except as otherwise provided by this section and section 1693h of this title, any person who fails to comply with any provision of this subchapter with respect to any consumer, except for an error resolved in accordance with section 1693f of this title, is liable to such consumer in an amount equal to the sum of—

(1) any actual damage sustained by such consumer as a result of such failure;

(2)(A) in the case of an individual action, an amount not less than $100 nor greater than $1,000; or

(B) in the case of a class action, such amount as the court may allow, except that (i) as to each member of the class no minimum recovery shall be applicable, and (ii) the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same person shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the defendant; and

(3) in the case of any successful action to enforce the foregoing liability, the costs of the action, together with a reasonable attorney's fee as determined by the court.

**(b) Factors determining amount of award**

In determining the amount of liability in any action under subsection (a), the court shall consider, among other relevant factors—

(1) in any individual action under subsection (a)(2)(A), the frequency and persistence of noncompliance, the nature of such noncompliance, and the extent to which the noncompliance was intentional; or

(2) in any class action under subsection (a)(2)(B), the frequency and persistence of noncompliance, the nature of such noncompliance, the resources of the defendant, the number of persons adversely affected, and the extent to which the noncompliance was intentional.

**(c) Unintentional violations; bona fide error**

Except as provided in section 1693h of this title, a person may not be held liable in any action brought under this section for a violation of this subchapter if the person shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

**(d) Good faith compliance with rule, regulation, or interpretation**

No provision of this section or section 1693n [1] of this title imposing any liability shall apply to—

(1) any act done or omitted in good faith in conformity with any rule, regulation, or interpretation thereof by the Bureau or the Board or in conformity with any interpretation or approval by an official or employee of the Bureau of

Consumer Financial Protection or the Federal Reserve System duly authorized by the Bureau or the Board to issue such interpretations or approvals under such procedures as the Bureau or the Board may prescribe therefor; or

(2) any failure to make disclosure in proper form if a financial institution utilized an appropriate model clause issued by the Bureau or the Board,

notwithstanding that after such act, omission, or failure has occurred, such rule, regulation, approval, or model clause is amended, rescinded, or determined by judicial or other authority to be invalid for any reason.

**(e) Notification to consumer prior to action; adjustment of consumer's account**

A person has no liability under this section for any failure to comply with any requirement under this subchapter if, prior to the institution of an action under this section, the person notifies the consumer concerned of the failure, complies with the requirements of this subchapter, and makes an appropriate adjustment to the consumer's account and pays actual damages or, where applicable, damages in accordance with section 1693h of this title.

**(f) Action in bad faith or for harassment; attorney's fees**

On a finding by the court that an unsuccessful action under this section was brought in bad faith or for purposes of harassment, the court shall award to the defendant attorney's fees reasonable in relation to the work expended and costs.

**(g) Jurisdiction of courts; time for maintenance of action**

Without regard to the amount in controversy, any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.

(Pub. L. 90–321, title IX, §916, formerly §915, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3737; renumbered §916, Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751; amended Pub. L. 111–203, title X, §1084(1), (4), July 21, 2010, 124 Stat. 2081, 2082.)

### Editorial Notes

## References in Text

Section 1693n of this title, referred to in subsec. (d), was in the original a reference to section 916 of Pub. L. 90–321, and was translated as meaning section 917 of Pub. L. 90–321 to reflect the probable intent of Congress and the renumbering of section 916 of Pub. L. 90–321 as section 917 by Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751.

## Prior Provisions

A prior section 916 of Pub. L. 90–321 was renumbered section 917 and is classified to section 1693n of this title.

## Amendments

**2010**—Pub. L. 111–203, §1084(1), which directed the substitution of "Bureau" for "Board" wherever appearing in section, was not executed in subsec. (d), which was the only place such term appeared, to reflect the probable intent of Congress and the amendment by Pub. L. 111–203, §1084(4). See below.

Subsec. (d). Pub. L. 111–203, §1084(4), struck out "of Board or approval of duly authorized official or employee of Federal Reserve System" after "interpretation" in heading that had been supplied editorially and inserted "Bureau of Consumer Financial Protection or the" before "Federal Reserve System" in par. (1) and "Bureau or the" before "Board" wherever appearing.

### Statutory Notes and Related Subsidiaries

## Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

[1] See References in Text note below.

# §1693n. Criminal liability

**(a) Violations respecting giving of false or inaccurate information, failure to provide information, and failure to comply with provisions of this subchapter**

Whoever knowingly and willfully—

(1) gives false or inaccurate information or fails to provide information which he is required to disclose by this subchapter or any regulation issued thereunder; or

(2) otherwise fails to comply with any provision of this subchapter;

shall be fined not more than $5,000 or imprisoned not more than one year, or both.

**(b) Violations affecting interstate or foreign commerce**

Whoever—

(1) knowingly, in a transaction affecting interstate or foreign commerce, uses or attempts or conspires to use any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained debit instrument to obtain money, goods, services, or anything else of value which within any one-year period has a value aggregating $1,000 or more; or

(2) with unlawful or fraudulent intent, transports or attempts or conspires to transport in interstate or foreign commerce a counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained debit instrument knowing the same to be counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained; or

(3) with unlawful or fraudulent intent, uses any instrumentality of interstate or foreign commerce to sell or transport a counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained debit instrument knowing the same to be counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained; or

(4) knowingly receives, conceals, uses, or transports money, goods, services, or anything else of value (except tickets for interstate or foreign transportation) which (A) within any one-year period has a value aggregating $1,000 or more, (B) has moved in or is part of, or which constitutes interstate or foreign commerce, and (C) has been obtained with a counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained debit instrument; or

(5) knowingly receives, conceals, uses, sells, or transports in interstate or foreign commerce one or more tickets for interstate or foreign transportation, which (A) within any one-year period have a value aggregating $500 or more, and (B) have been purchased or obtained with one or more counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained debit instrument; or

(6) in a transaction affecting interstate or foreign commerce, furnishes money, property, services, or anything else of value, which within any one-year period has a value aggregating $1,000 or more, through the use of any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained debit instrument knowing the same to be counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained—

shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

**(c) "Debit instrument" defined**

As used in this section, the term "debit instrument" means a card, code, or other device, other than a check, draft, or similar paper instrument, by the use of which a person may initiate an electronic fund transfer.

(Pub. L. 90–321, title IX, §917, formerly §916, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3738; renumbered §917, Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751.)

**EDITORIAL NOTES**

**PRIOR PROVISIONS**

A prior section 917 of Pub. L. 90–321 was renumbered section 918 and is classified to section 1693o of this title.

# §1693o. Administrative enforcement

**(a) Enforcing agencies**

Subject to subtitle B of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5511 et seq.], compliance with the requirements imposed under this subchapter shall be enforced under—

(1) section 8 of the Federal Deposit Insurance Act [12 U.S.C. 1818], by the appropriate Federal banking agency, as defined in section 3(q) of the Federal Deposit Insurance Act (12 U.S.C. 1813(q)), with respect to—

(A) national banks, Federal savings associations, and Federal branches and Federal agencies of foreign banks;

(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act [12 U.S.C. 601 et seq., 611 et seq.]; and

(C) banks and State savings associations insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), and insured State branches of foreign banks;

(2) the Federal Credit Union Act [12 U.S.C. 1751 et seq.], by the Administrator of the National Credit Union Administration with respect to any Federal credit union;

(3) part A of subtitle VII of title 49, by the Secretary of Transportation, with respect to any air carrier or foreign air carrier subject to that part;

(4) the Securities Exchange Act of 1934 [15 U.S.C. 78a et seq.], by the Securities and Exchange Commission, with respect to any broker or dealer subject to that Act and [1]

(5) subtitle E of the Consumer Financial Protection Act of 2010 [12 U.S.C. 5561 et seq.], by the Bureau, with respect to any person subject to this subchapter, except that the Bureau shall not have authority to enforce the requirements of section 1693o–2 of this title or any regulations prescribed by the Board under section 1693o–2 of this title.

The terms used in paragraph (1) that are not defined in this subchapter or otherwise defined in section 3(s) of the Federal Deposit Insurance Act (12 U.S.C. 1813(s)) shall have the meaning given to them in section 1(b) of the International Banking Act of 1978 (12 U.S.C. 3101).

**(b) Violations of subchapter deemed violations of pre-existing statutory requirements; additional powers**

For the purpose of the exercise by any agency referred to in any of paragraphs (1) through (4) of subsection (a) of its powers under any Act referred to in that subsection, a violation of any requirement imposed under this subchapter shall be deemed to be a violation of a requirement imposed under that Act. In addition to its powers under any provision of law specifically referred to in any of paragraphs (1) through (4) of subsection (a), each of the agencies referred to in that subsection may exercise, for the purpose of enforcing compliance with any requirement imposed under this subchapter, any other authority conferred on it by law.

**(c) Overall enforcement authority of the Federal Trade Commission**

Except to the extent that enforcement of the requirements imposed under this subchapter is specifically committed to some other Government agency under any of paragraphs (1) through (4) of subsection (a), and subject to subtitle B of the Consumer Financial Protection Act of 2010, the Federal Trade Commission shall be authorized to enforce such requirements. For the purpose of the exercise by the Federal Trade Commission of its functions and powers under the Federal Trade Commission Act [15 U.S.C. 41 et seq.], a violation of any requirement imposed under this subchapter shall be deemed a violation of a requirement imposed under that Act. All of the functions and powers of the Federal Trade Commission under the Federal Trade Commission Act are available to the Federal Trade Commission to enforce compliance by any person subject to the jurisdiction of the Federal Trade Commission with the requirements imposed under this subchapter, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests under the Federal Trade Commission Act.

(Pub. L. 90–321, title IX, §918, formerly §917, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3739; amended Pub. L. 101–73, title VII, §744(o), Aug. 9, 1989, 103 Stat. 440; Pub. L. 102–242, title II, §212(f), Dec. 19, 1991, 105 Stat. 2301; Pub. L. 104–287, §6(h), Oct. 11, 1996, 110 Stat. 3399; renumbered §918, Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751; Pub. L. 111–203, title X, §1084(5), July 21, 2010, 124 Stat. 2082.)

**EDITORIAL NOTES**

## REFERENCES IN TEXT

The Consumer Financial Protection Act of 2010, referred to in subsecs. (a) and (c), is title X of Pub. L. 111–203, July 21, 2010, 124 Stat. 1955. Subtitles B (§§1021–1029A) and E (§§1051–1058) of the Act are classified generally to parts B (§5511 et seq.) and E (§5561 et seq.), respectively, of subchapter V of chapter 53 of Title 12, Banks and Banking. For complete classification of subtitles B and E to the Code, see Tables.

Sections 25 and 25A of the Federal Reserve Act, referred to in subsec. (a)(1)(B), are classified to subchapters I (§601 et seq.) and II (§611 et seq.), respectively, of chapter 6 of Title 12, Banks and Banking.

The Federal Credit Union Act, referred to in subsec. (a)(2), is act June 26, 1934, ch. 750, 48 Stat. 1216, which is classified generally to chapter 14 (§1751 et seq.) of Title 12. For complete classification of this Act to the Code, see section 1751 of Title 12 and Tables.

The Securities Exchange Act of 1934, referred to in subsec. (a)(4), is act June 6, 1934, ch. 404, 48 Stat. 881, which is classified principally to chapter 2B (§78a et seq.) of this title. For complete classification of this Act to the Code, see section 78a of this title and Tables.

The Federal Trade Commission Act, referred to in subsec. (c), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§41 et seq.) of chapter 2 of this title. For complete classification of this Act to the Code, see section 58 of this title and Tables.

## CODIFICATION

In subsec. (a)(3), "part A of subtitle VII of title 49" substituted for "the Federal Aviation Act of 1958 [49 App. U.S.C. 1301 et seq.]" and "that part" substituted for "that Act" on authority of Pub. L. 103–272, §6(b), July 5, 1994, 108 Stat. 1378, the first section of which enacted subtitles II, III, and V to X of Title 49, Transportation.

## Prior Provisions

A prior section 918 of Pub. L. 90–321 was renumbered section 921 and is classified to section 1693p of this title.

## Amendments

**2010**—Subsec. (a). Pub. L. 111–203, §1084(5)(A)(i), substituted "Subject to subtitle B of the Consumer Financial Protection Act of 2010, compliance" for "Compliance" in introductory provisions.

Subsec. (a)(1). Pub. L. 111–203, §1084(5)(A)(ii), added par. (1) and struck out former par. (1) which read as follows: "section 8 of the Federal Deposit Insurance Act, in the case of—

"(A) national banks, and Federal branches and Federal agencies of foreign banks, by the Office of the Comptroller of the Currency;

"(B) member banks of the Federal Reserve System (other than national banks), branches and agencies of foreign banks (other than Federal branches, Federal agencies, and insured State branches of foreign banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25(a) of the Federal Reserve Act, by the Board; and

"(C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System) and insured State branches of foreign banks, by the Board of Directors of the Federal Deposit Insurance Corporation;".

Subsec. (a)(2) to (5). Pub. L. 111–203, §1084(5)(A)(ii)–(vii), added par. (5), redesignated former pars. (3) to (5) as (2) to (4), respectively, and struck out former par. (2) which read as follows: "section 8 of the Federal Deposit Insurance Act, by the Director of the Office of Thrift Supervision, in the case of a savings association the deposits of which are insured by the Federal Deposit Insurance Corporation;".

Subsec. (b). Pub. L. 111–203, §1084(5)(B), inserted "any of paragraphs (1) through (4) of" before "subsection (a)" in two places.

Subsec. (c). Pub. L. 111–203, §1084(5)(C), added subsec. (c) and struck out former subsec. (c). Prior to amendment, text read as follows: "Except to the extent that enforcement of the requirements imposed under this subchapter is specifically committed to some other Government agency under subsection (a) of this section, the Federal Trade Commission shall enforce such requirements. For the purpose of the exercise by the Federal Trade Commission of its functions and powers under the Federal Trade Commission Act, a violation of any requirement imposed under this subchapter shall be deemed a violation of a requirement imposed under that Act. All of the functions and powers of the Federal Trade Commission under the Federal Trade Commission Act are available to the Commission to enforce compliance by any person subject to the jurisdiction of the Commission with the requirements imposed under this subchapter, irrespective of whether that person is engaged in commerce or meets any other jurisdictional tests in the Federal Trade Commission Act."

**1996**—Subsec. (a)(4). Pub. L. 104–287 substituted "Secretary of Transportation" for "Civil Aeronautics Board".

**1991**—Subsec. (a). Pub. L. 102–242, §212(f)(2), inserted at end "The terms used in paragraph (1) that are not defined in this subchapter or otherwise defined in section 3(s) of the Federal Deposit Insurance Act (12 U.S.C. 1813(s)) shall have the meaning given to them in section 1(b) of the International Banking Act of 1978 (12 U.S.C. 3101)."

Pub. L. 102–242, §212(f)(1), added par. (1) and struck out former par. (1) which read as follows: "section 8 of the Federal Deposit Insurance Act, in the case of—

"(A) national banks, by the Comptroller of the Currency;

"(B) member banks of the Federal Reserve System (other than national banks), by the Board;

"(C) banks insured by the Federal Deposit Insurance Corporation (other than members of the Federal Reserve System), by the Board of Directors of the Federal Deposit Insurance Corporation;".

**1989**—Subsec. (a)(2). Pub. L. 101–73 amended par. (2) generally. Prior to amendment, par. (2) read as follows: "section 5(d) of the Home Owners' Loan Act of 1933, section 407 of the National Housing Act, and sections 6(i) and 17 of the Federal Home Loan Bank Act, by the Federal Home Loan Bank Board (acting directly or through the Federal Savings and Loan Insurance Corporation), in the case of any institution subject to any of those provisions;".

Statutory Notes and Related Subsidiaries

## Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## Transfer of Functions

Functions vested in Administrator of National Credit Union Administration transferred and vested in National Credit Union Administration Board pursuant to section 1752a of Title 12, Banks and Banking.

___

[1] *So in original. Probably should be "; and".*

## §1693o–1. Remittance transfers

### (a) Disclosures required for remittance transfers

#### (1) In general

Each remittance transfer provider shall make disclosures as required under this section and in accordance with rules prescribed by the Bureau. Disclosures required under this section shall be in addition to any other disclosures applicable under this subchapter.

#### (2) Disclosures

Subject to rules prescribed by the Bureau, a remittance transfer provider shall provide, in writing and in a form that the sender may keep, to each sender requesting a remittance transfer, as applicable to the transaction—

(A) at the time at which the sender requests a remittance transfer to be initiated, and prior to the sender making any payment in connection with the remittance transfer, a disclosure describing—

(i) the amount of currency that will be received by the designated recipient, using the values of the currency into which the funds will be exchanged;

(ii) the amount of transfer and any other fees charged by the remittance transfer provider for the remittance transfer; and

(iii) any exchange rate to be used by the remittance transfer provider for the remittance transfer, to the nearest 1/100th of a point; and

(B) at the time at which the sender makes payment in connection with the remittance transfer—

(i) a receipt showing—

(I) the information described in subparagraph (A);

(II) the promised date of delivery to the designated recipient; and

(III) the name and either the telephone number or the address of the designated recipient, if either the telephone number or the address of the designated recipient is provided by the sender; and

(ii) a statement containing—

(I) information about the rights of the sender under this section regarding the resolution of errors; and

(II) appropriate contact information for—

(aa) the remittance transfer provider; and

(bb) the State agency that regulates the remittance transfer provider and the Bureau, including the toll-free telephone number established under section 5493 of title 12.

#### (3) Requirements relating to disclosures

With respect to each disclosure required to be provided under paragraph (2) a remittance transfer provider shall—

(A) provide an initial notice and receipt, as required by subparagraphs (A) and (B) of paragraph (2), and an error resolution statement, as required by subsection (d), that clearly and conspicuously describe the information required to be disclosed therein; and

(B) with respect to any transaction that a sender conducts electronically, comply with the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7001 et seq.).

#### (4) Exception for disclosures of amount received

##### (A) In general

Subject to the rules prescribed by the Bureau, and except as provided under subparagraph (B), the disclosures required regarding the amount of currency that will be received by the designated recipient shall be deemed to be accurate, so long as the disclosures provide a reasonably accurate estimate of the foreign currency to be received. This paragraph shall apply only to a remittance transfer provider who is an insured depository institution, as defined in section 1813 of title 12, or an insured credit union, as defined in section 1752 of title 12, and if—

(i) a remittance transfer is conducted through a demand deposit, savings deposit, or other asset account that the sender holds with such remittance transfer provider; and

(ii) at the time at which the sender requests the transaction, the remittance transfer provider is unable to know, for reasons beyond its control, the amount of currency that will be made available to the designated recipient.

##### (B) Deadline

The application of subparagraph (A) shall terminate 5 years after July 21, 2010, unless the Bureau determines that termination of such provision would negatively affect the ability of remittance transfer providers described in subparagraph (A) to send remittances to locations in foreign countries, in which case, the Bureau may, by rule, extend the application of subparagraph (A) to not longer than 10 years after July 21, 2010.

**(5) Exemption authority**

The Bureau may, by rule, permit a remittance transfer provider to satisfy the requirements of—

(A) paragraph (2)(A) orally, if the transaction is conducted entirely by telephone;

(B) paragraph (2)(B), in the case of a transaction conducted entirely by telephone, by mailing the disclosures required under such subparagraph to the sender, not later than 1 business day after the date on which the transaction is conducted, or by including such documents in the next periodic statement, if the telephone transaction is conducted through a demand deposit, savings deposit, or other asset account that the sender holds with the remittance transfer provider;

(C) subparagraphs (A) and (B) of paragraph (2) together in one written disclosure, but only to the extent that the information provided in accordance with paragraph (3)(A) is accurate at the time at which payment is made in connection with the subject remittance transfer; and

(D) paragraph (2)(A), without compliance with section 101(c) of the Electronic Signatures in Global Commerce Act [15 U.S.C. 7001(c)], if a sender initiates the transaction electronically and the information is displayed electronically in a manner that the sender can keep.

**(6) Storefront and Internet notices**

**(A) In general**

**(i) Prominent posting**

Subject to subparagraph (B), the Bureau may prescribe rules to require a remittance transfer provider to prominently post, and timely update, a notice describing a model remittance transfer for one or more amounts, as the Bureau may determine, which notice shall show the amount of currency that will be received by the designated recipient, using the values of the currency into which the funds will be exchanged.

**(ii) Onsite displays**

The Bureau may require the notice prescribed under this subparagraph to be displayed in every physical storefront location owned or controlled by the remittance transfer provider.

**(iii) Internet notices**

Subject to paragraph (3), the Bureau shall prescribe rules to require a remittance transfer provider that provides remittance transfers via the Internet to provide a notice, comparable to a storefront notice described in this subparagraph, located on the home page or landing page (with respect to such remittance transfer services) owned or controlled by the remittance transfer provider.

**(iv) Rulemaking authority**

In prescribing rules under this subparagraph, the Bureau may impose standards or requirements regarding the provision of the storefront and Internet notices required under this subparagraph and the provision of the disclosures required under paragraphs (2) and (3).

**(B) Study and analysis**

Prior to proposing rules under subparagraph (A), the Bureau shall undertake appropriate studies and analyses, which shall be consistent with section 1693b(a)(2) of this title, and may include an advanced notice of proposed rulemaking, to determine whether a storefront notice or Internet notice facilitates the ability of a consumer—

(i) to compare prices for remittance transfers; and

(ii) to understand the types and amounts of any fees or costs imposed on remittance transfers.

**(b) Foreign language disclosures**

The disclosures required under this section shall be made in English and in each of the foreign languages principally used by the remittance transfer provider, or any of its agents, to advertise, solicit, or market, either orally or in writing, at that office.

**(c) Regulations regarding transfers to certain nations**

If the Bureau determines that a recipient nation does not legally allow, or the method by which transactions are made in the recipient country do not allow, a remittance transfer provider to know the amount of currency that will be received by the designated recipient, the Bureau may prescribe rules (not later than 18 months after July 21, 2010) addressing the issue, which rules shall include standards for a remittance transfer provider to provide—

(1) a receipt that is consistent with subsections (a) and (b); and

(2) a reasonably accurate estimate of the foreign currency to be received, based on the rate provided to the sender by the remittance transfer provider at the time at which the transaction was initiated by the sender.

**(d) Remittance transfer errors**

**(1) Error resolution**

**(A) In general**

If a remittance transfer provider receives oral or written notice from the sender within 180 days of the promised date of delivery that an error occurred with respect to a remittance transfer, including the amount of currency designated in subsection (a)(3)(A) that was to be sent to the designated recipient of the remittance transfer, using the values of the currency into which the funds should have been exchanged, but was not made available to the designated recipient in the foreign country, the remittance transfer provider shall resolve the error pursuant to this subsection and investigate the reason for the error.

**(B) Remedies**

Not later than 90 days after the date of receipt of a notice from the sender pursuant to subparagraph (A), the remittance transfer provider shall, as applicable to the error and as designated by the sender—

(i) refund to the sender the total amount of funds tendered by the sender in connection with the remittance transfer which was not properly transmitted;

(ii) make available to the designated recipient, without additional cost to the designated recipient or to the sender, the amount appropriate to resolve the error;

(iii) provide such other remedy, as determined appropriate by rule of the Bureau for the protection of senders; or

(iv) provide written notice to the sender that there was no error with an explanation responding to the specific complaint of the sender.

**(2) Rules**

The Bureau shall establish, by rule issued not later than 18 months after July 21, 2010, clear and appropriate standards for remittance transfer providers with respect to error resolution relating to remittance transfers, to protect senders from such errors. Standards prescribed under this paragraph shall include appropriate standards regarding record keeping, as required, including documentation—

(A) of the complaint of the sender;

(B) that the sender provides the remittance transfer provider with respect to the alleged error; and

(C) of the findings of the remittance transfer provider regarding the investigation of the alleged error that the sender brought to their attention.

**(3) Cancellation and refund policy rules**

Not later than 18 months after July 21, 2010, the Bureau shall issue final rules regarding appropriate remittance transfer cancellation and refund policies for consumers.

**(e) Applicability of this subchapter**

**(1) In general**

A remittance transfer that is not an electronic fund transfer, as defined in section 1693a of this title, shall not be subject to any of the provisions of sections 1693c through 1693k of this title. A remittance transfer that is an electronic fund transfer, as defined in section 1693a of this title, shall be subject to all provisions of this subchapter, except for section 1693f of this title, that are otherwise applicable to electronic fund transfers under this subchapter.

**(2) Rule of construction**

Nothing in this section shall be construed—

(A) to affect the application to any transaction, to any remittance provider, or to any other person of any of the provisions of subchapter II of chapter 53 of title 31, section 1829b of title 12, or chapter 2 of title I of Public Law 91–508 (12 U.S.C. 1951–1959), or any regulations promulgated thereunder; or

(B) to cause any fund transfer that would not otherwise be treated as such under paragraph (1) to be treated as an electronic fund transfer, or as otherwise subject to this subchapter, for the purposes of any of the provisions referred to in subparagraph (A) or any regulations promulgated thereunder.

**(f) Acts of agents**

**(1) In general**

A remittance transfer provider shall be liable for any violation of this section by any agent, authorized delegate, or person affiliated with such provider, when such agent, authorized delegate, or affiliate acts for that remittance transfer provider.

**(2) Obligations of remittance transfer providers**

The Bureau shall prescribe rules to implement appropriate standards or conditions of, liability of a remittance transfer provider, including a provider who acts through an agent or authorized delegate. An agency charged with enforcing the requirements of this section, or rules prescribed by the Bureau under this section, may consider, in any action or other proceeding against a remittance transfer provider, the extent to which the provider had established and maintained policies or procedures for compliance, including policies, procedures, or other appropriate oversight measures designed to assure compliance by an agent or authorized delegate acting for such provider.

**(g) Definitions**

As used in this section—

(1) the term "designated recipient" means any person located in a foreign country and identified by the sender as the authorized recipient of a remittance transfer to be made by a remittance transfer provider, except that a designated recipient shall not be deemed to be a consumer for purposes of this chapter;

(2) the term "remittance transfer"—

(A) means the electronic (as defined in section 106(2) of the Electronic Signatures in Global and National Commerce Act (15 U.S.C. 7006(2))) transfer of funds requested by a sender located in any State to a designated recipient that is initiated by a remittance transfer provider, whether or not the sender holds an account with the remittance transfer provider or whether or not the remittance transfer is also an electronic fund transfer, as defined in section 1693a of this title; and

(B) does not include a transfer described in subparagraph (A) in an amount that is equal to or lesser than the amount of a small-value transaction determined, by rule, to be excluded from the requirements under section 1693d(a) of this title;

(3) the term "remittance transfer provider" means any person or financial institution that provides remittance transfers for a consumer in the normal course of its business, whether or not the consumer holds an account with such person or financial institution; and

(4) the term "sender" means a consumer who requests a remittance provider to send a remittance transfer for the consumer to a designated recipient.

(Pub. L. 90–321, title IX, §919, as added and amended Pub. L. 111–203, title X, §§1073(a)(4), 1084(1), July 21, 2010, 124 Stat. 2060, 2081.)

**EDITORIAL NOTES**

## REFERENCES IN TEXT

The Electronic Signatures in Global and National Commerce Act, referred to in subsec. (a)(3)(B), is Pub. L. 106–229, June 30, 2000, 114 Stat. 464, which is classified principally to chapter 96 (§7001 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 7001 of this title and Tables.

Chapter 2 of title I of Public Law 91–508, referred to in subsec. (e)(2)(A), is chapter 2 (§§121–129) of title I of Pub. L. 91–508, Oct. 26, 1970, 84 Stat. 1116, which is classified generally to chapter 21 (§1951 et seq.) of Title 12, Banks and Banking. For complete classification of chapter 2 of title I of the Act to the Code, see Tables.

## PRIOR PROVISIONS

A prior section 919 of Pub. L. 90–321 was renumbered section 921 and is classified to section 1693p of this title.

Another prior section 919 of Pub. L. 90–321 was renumbered section 922 and is classified to section 1693q of this title.

## AMENDMENTS

**2010**—Pub. L. 111–203, §1084(1), substituted "Bureau" for "Board" wherever appearing.

**STATUTORY NOTES AND RELATED SUBSIDIARIES**

## EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by section 1084(1) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

## EFFECTIVE DATE

Section effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as a note under section 5301 of Title 12, Banks and Banking.

# §1693o–2. Reasonable fees and rules for payment card transactions

**(a) Reasonable interchange transaction fees for electronic debit transactions**

**(1) Regulatory authority over interchange transaction fees**

The Board may prescribe regulations, pursuant to section 553 of title 5, regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction, to implement this subsection (including related definitions), and to prevent circumvention or evasion of this subsection.

**(2) Reasonable interchange transaction fees**

The amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

**(3) Rulemaking required**

**(A) In general**

The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for assessing whether the amount of any interchange transaction fee described in paragraph (2) is reasonable and proportional to the cost incurred by the issuer with respect to the transaction.

**(B) Information collection**

The Board may require any issuer (or agent of an issuer) or payment card network to provide the Board with such information as may be necessary to carry out the provisions of this subsection and the Board, in issuing rules under subparagraph (A) and on at least a bi-annual basis thereafter, shall disclose such aggregate or summary information concerning the costs incurred, and interchange transaction fees charged or received, by issuers or payment card networks in connection with the authorization, clearance or settlement of electronic debit transactions as the Board considers appropriate and in the public interest.

**(4) Considerations; consultation**

In prescribing regulations under paragraph (3)(A), the Board shall—
    (A) consider the functional similarity between—
      (i) electronic debit transactions; and
      (ii) checking transactions that are required within the Federal Reserve bank system to clear at par;

    (B) distinguish between—
      (i) the incremental cost incurred by an issuer for the role of the issuer in the authorization, clearance, or settlement of a particular electronic debit transaction, which cost shall be considered under paragraph (2); and
      (ii) other costs incurred by an issuer which are not specific to a particular electronic debit transaction, which costs shall not be considered under paragraph (2); and

    (C) consult, as appropriate, with the Comptroller of the Currency, the Board of Directors of the Federal Deposit Insurance Corporation, the Director of the Office of Thrift Supervision, the National Credit Union Administration Board, the Administrator of the Small Business Administration, and the Director of the Bureau of Consumer Financial Protection.

**(5) Adjustments to interchange transaction fees for fraud prevention costs**

**(A) Adjustments**

The Board may allow for an adjustment to the fee amount received or charged by an issuer under paragraph (2), if—
    (i) such adjustment is reasonably necessary to make allowance for costs incurred by the issuer in preventing fraud in relation to electronic debit transactions involving that issuer; and
    (ii) the issuer complies with the fraud-related standards established by the Board under subparagraph (B), which standards shall—
      (I) be designed to ensure that any fraud-related adjustment of the issuer is limited to the amount described in clause (i) and takes into account any fraud-related reimbursements (including amounts from charge-backs) received from consumers, merchants, or payment card networks in relation to electronic debit transactions involving the issuer; and
      (II) require issuers to take effective steps to reduce the occurrence of, and costs from, fraud in relation to electronic debit transactions, including through the development and implementation of cost-effective fraud prevention technology.

**(B) Rulemaking required**

**(i) In general**

The Board shall prescribe regulations in final form not later than 9 months after July 21, 2010, to establish standards for making adjustments under this paragraph.

**(ii) Factors for consideration**

In issuing the standards and prescribing regulations under this paragraph, the Board shall consider—
    (I) the nature, type, and occurrence of fraud in electronic debit transactions;

(II) the extent to which the occurrence of fraud depends on whether authorization in an electronic debit transaction is based on signature, PIN, or other means;

(III) the available and economical means by which fraud on electronic debit transactions may be reduced;

(IV) the fraud prevention and data security costs expended by each party involved in electronic debit transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

(V) the costs of fraudulent transactions absorbed by each party involved in such transactions (including consumers, persons who accept debit cards as a form of payment, financial institutions, retailers and payment card networks);

(VI) the extent to which interchange transaction fees have in the past reduced or increased incentives for parties involved in electronic debit transactions to reduce fraud on such transactions; and

(VII) such other factors as the Board considers appropriate.

## (6) Exemption for small issuers

### (A) In general

This subsection shall not apply to any issuer that, together with its affiliates, has assets of less than $10,000,000,000, and the Board shall exempt such issuers from regulations prescribed under paragraph (3)(A).

### (B) Definition

For purposes of this paragraph, the term "issuer" shall be limited to the person holding the asset account that is debited through an electronic debit transaction.

## (7) Exemption for government-administered payment programs and reloadable prepaid cards

### (A) In general

This subsection shall not apply to an interchange transaction fee charged or received with respect to an electronic debit transaction in which a person uses—

(i) a debit card or general-use prepaid card that has been provided to a person pursuant to a Federal, State or local government-administered payment program, in which the person may only use the debit card or general-use prepaid card to transfer or debit funds, monetary value, or other assets that have been provided pursuant to such program; or

(ii) a plastic card, payment code, or device that is—

(I) linked to funds, monetary value, or assets which are purchased or loaded on a prepaid basis;

(II) not issued or approved for use to access or debit any account held by or for the benefit of the card holder (other than a subaccount or other method of recording or tracking funds purchased or loaded on the card on a prepaid basis);

(III) redeemable at multiple, unaffiliated merchants or service providers, or automated teller machines;

(IV) used to transfer or debit funds, monetary value, or other assets; and

(V) reloadable and not marketed or labeled as a gift card or gift certificate.

### (B) Exception

Notwithstanding subparagraph (A), after the end of the 1-year period beginning on the effective date provided in paragraph (9), this subsection shall apply to an interchange transaction fee charged or received with respect to an electronic debit transaction described in subparagraph (A)(i) in which a person uses a general-use prepaid card, or an electronic debit transaction described in subparagraph (A)(ii), if any of the following fees may be charged to a person with respect to the card:

(i) A fee for an overdraft, including a shortage of funds or a transaction processed for an amount exceeding the account balance.

(ii) A fee imposed by the issuer for the first withdrawal per month from an automated teller machine that is part of the issuer's designated automated teller machine network.

### (C) Definition

For purposes of subparagraph (B), the term "designated automated teller machine network" means either—

(i) all automated teller machines identified in the name of the issuer; or

(ii) any network of automated teller machines identified by the issuer that provides reasonable and convenient access to the issuer's customers.

### (D) Reporting

Beginning 12 months after July 21, 2010, the Board shall annually provide a report to the Congress regarding —

(i) the prevalence of the use of general-use prepaid cards in Federal, State or local government-administered payment programs; and

(ii) the interchange transaction fees and cardholder fees charged with respect to the use of such general-use prepaid cards.

## (8) Regulatory authority over network fees

### (A) In general

The Board may prescribe regulations, pursuant to section 553 of title 5, regarding any network fee.

**(B) Limitation**

The authority under subparagraph (A) to prescribe regulations shall be limited to regulations to ensure that—

(i) a network fee is not used to directly or indirectly compensate an issuer with respect to an electronic debit transaction; and

(ii) a network fee is not used to circumvent or evade the restrictions of this subsection and regulations prescribed under such subsection.

**(C) Rulemaking required**

The Board shall prescribe regulations in final form before the end of the 9-month period beginning on July 21, 2010, to carry out the authorities provided under subparagraph (A).

**(9) Effective date**

This subsection shall take effect at the end of the 12-month period beginning on July 21, 2010.

**(b) Limitation on payment card network restrictions**

**(1) Prohibitions against exclusivity arrangements**

**(A) No exclusive network**

The Board shall, before the end of the 1-year period beginning on July 21, 2010, prescribe regulations providing that an issuer or payment card network shall not directly or through any agent, processor, or licensed member of a payment card network, by contract, requirement, condition, penalty, or otherwise, restrict the number of payment card networks on which an electronic debit transaction may be processed to—

(i) 1 such network; or

(ii) 2 or more such networks which are owned, controlled, or otherwise operated by —

(I) affiliated persons; or

(II) networks affiliated with such issuer.

**(B) No routing restrictions**

The Board shall, before the end of the 1-year period beginning on July 21, 2010, prescribe regulations providing that an issuer or payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person who accepts debit cards for payments to direct the routing of electronic debit transactions for processing over any payment card network that may process such transactions.

**(2) Limitation on restrictions on offering discounts for use of a form of payment**

**(A) In general**

A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability of any person to provide a discount or in-kind incentive for payment by the use of cash, checks, debit cards, or credit cards to the extent that—

(i) in the case of a discount or in-kind incentive for payment by the use of debit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network;

(ii) in the case of a discount or in-kind incentive for payment by the use of credit cards, the discount or in-kind incentive does not differentiate on the basis of the issuer or the payment card network; and

(iii) to the extent required by Federal law and applicable State law, such discount or in-kind incentive is offered to all prospective buyers and disclosed clearly and conspicuously.

**(B) Lawful discounts**

For purposes of this paragraph, the network may not penalize any person for the providing of a discount that is in compliance with Federal law and applicable State law.

**(3) Limitation on restrictions on setting transaction minimums or maximums**

**(A) In general**

A payment card network shall not, directly or through any agent, processor, or licensed member of the network, by contract, requirement, condition, penalty, or otherwise, inhibit the ability—

(i) of any person to set a minimum dollar value for the acceptance by that person of credit cards, to the extent that—

(I) such minimum dollar value does not differentiate between issuers or between payment card networks; and

(II) such minimum dollar value does not exceed $10.00; or

(ii) of any Federal agency or institution of higher education to set a maximum dollar value for the acceptance by that Federal agency or institution of higher education of credit cards, to the extent that such maximum dollar value does not differentiate between issuers or between payment card networks.

**(B) Increase in minimum dollar amount**

The Board may, by regulation prescribed pursuant to section 553 of title 5, increase the amount of the dollar value listed in subparagraph (A)(i)(II).

**(4) Rule of construction**

No provision of this subsection shall be construed to authorize any person—

(A) to discriminate between debit cards within a payment card network on the basis of the issuer that issued the debit card; or

(B) to discriminate between credit cards within a payment card network on the basis of the issuer that issued the credit card.

## (c) Definitions

For purposes of this section, the following definitions shall apply:

**(1) Affiliate**

The term "affiliate" means any company that controls, is controlled by, or is under common control with another company.

**(2) Debit card**

The term "debit card"—

(A) means any card, or other payment code or device, issued or approved for use through a payment card network to debit an asset account (regardless of the purpose for which the account is established), whether authorization is based on signature, PIN, or other means;

(B) includes a general-use prepaid card, as that term is defined in section 1693l–1(a)(2)(A) of this title; and

(C) does not include paper checks.

**(3) Credit card**

The term "credit card" has the same meaning as in section 1602 of this title.

**(4) Discount**

The term "discount"—

(A) means a reduction made from the price that customers are informed is the regular price; and

(B) does not include any means of increasing the price that customers are informed is the regular price.

**(5) Electronic debit transaction**

The term "electronic debit transaction" means a transaction in which a person uses a debit card.

**(6) Federal agency**

The term "Federal agency" means—

(A) an agency (as defined in section 101 of title 31); and

(B) a Government corporation (as defined in section 103 of title 5).

**(7) Institution of higher education**

The term "institution of higher education" has the same meaning as in 1001 [1] and 1002 of title 20.

**(8) Interchange transaction fee**

The term "interchange transaction fee" means any fee established, charged or received by a payment card network for the purpose of compensating an issuer for its involvement in an electronic debit transaction.

**(9) Issuer**

The term "issuer" means any person who issues a debit card, or credit card, or the agent of such person with respect to such card.

**(10) Network fee**

The term "network fee" means any fee charged and received by a payment card network with respect to an electronic debit transaction, other than an interchange transaction fee.

**(11) Payment card network**

The term "payment card network" means an entity that directly, or through licensed members, processors, or agents, provides the proprietary services, infrastructure, and software that route information and data to conduct debit card or credit card transaction authorization, clearance, and settlement, and that a person uses in order to accept as a form of payment a brand of debit card, credit card or other device that may be used to carry out debit or credit transactions.

## (d) Enforcement

**(1) In general**

Compliance with the requirements imposed under this section shall be enforced under section 1693o of this title.

**(2) Exception**

Sections 1693m and 1693n of this title shall not apply with respect to this section or the requirements imposed pursuant to this section.

(Pub. L. 90–321, title IX, §920, as added Pub. L. 111–203, title X, §1075(a)(2), July 21, 2010, 124 Stat. 2068.)

EDITORIAL NOTES

## PRIOR PROVISIONS

A prior section 920 of Pub. L. 90–321 was renumbered section 921 and is classified to section 1693p of this title.

Two other prior sections 920 of Pub. L. 90–321 were renumbered section 922 and are classified to sections 1693q and 1693r of this title.

STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE

Section effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as a note under section 5301 of Title 12, Banks and Banking.

[1] So in original. Probably should be preceded by "sections".

## §1693p. Reports to Congress

(a) Not later than twelve months after the effective date of this subchapter and at one-year intervals thereafter, the Bureau shall make reports to the Congress concerning the administration of its functions under this subchapter, including such recommendations as the Bureau deems necessary and appropriate. In addition, each report of the Bureau shall include its assessment of the extent to which compliance with this subchapter is being achieved, and a summary of the enforcement actions taken under section 1693o [1] of this title. In such report, the Bureau shall particularly address the effects of this subchapter on the costs and benefits to financial institutions and consumers, on competition, on the introduction of new technology, on the operations of financial institutions, and on the adequacy of consumer protection.

(b) In the exercise of its functions under this subchapter, the Bureau may obtain upon request the views of any other Federal agency which, in the judgment of the Bureau, exercises regulatory or supervisory functions with respect to any class of persons subject to this subchapter.

(Pub. L. 90–321, title IX, §921, formerly §918, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3740; amended Pub. L. 97–375, title II, §209(a), Dec. 21, 1982, 96 Stat. 1825; renumbered §919, Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751; renumbered §920, renumbered §921, and amended Pub. L. 111–203, title X, §§1073(a)(3), 1075(a)(1), 1084(1), July 21, 2010, 124 Stat. 2060, 2068, 2081.)

EDITORIAL NOTES

## REFERENCES IN TEXT

For effective date of this subchapter, referred to in subsec. (a), see section 921 of Pub. L. 90–321, set out as an Effective Date note under section 1693 of this title.

Section 1693o of this title, referred to in subsec. (a), was in the original "section 917 of this title", and was translated as meaning section 918 of title I of Pub. L. 90–321 to reflect the probable intent of Congress and the renumbering of section 917 of title I of Pub. L. 90–321 as section 918 by Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751.

## CODIFICATION

Renumbering of section 918 of Pub. L. 90–321 as section 919 by section 401(1) of Pub. L. 111–24 was executed prior to the renumberings of section 919 of Pub. L. 90–321 as section 920 and then as section 921 by sections 1073(a)(3) and 1075(a)(1) of Pub. L. 111–203 as the probable intent of Congress, notwithstanding section 403 of Pub. L. 111–24, set out as an Effective Date note under section 1693l–1 of this title and section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking, which provided that the renumbering by Pub. L. 111–24 was effective 15 months after May 22, 2009, and the renumberings by Pub. L. 111–203 were effective 1 day after July 21, 2010.

### PRIOR PROVISIONS

Two prior sections 921 of Pub. L. 90–321 were renumbered section 922 and are classified to sections 1693q and 1693r of this title.

Another prior section 921 of Pub. L. 90–321 was renumbered section 923 and is classified as an Effective Date note under section 1693 of this title.

### AMENDMENTS

**2010**—Pub. L. 111–203, §1084(1), substituted "Bureau" for "Board" wherever appearing.

**1982**—Subsec. (a). Pub. L. 97–375 struck out requirement that the Attorney General make a report on the same terms as the Board, and that such report also contain an analysis of the impact of this subchapter on the operation, workload, and efficiency of the Federal courts, and substituted "necessary and appropriate" for "necessary or appropriate".

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by section 1084(1) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

¹ See References in Text note below.

## §1693q. Relation to State laws

This subchapter does not annul, alter, or affect the laws of any State relating to electronic fund transfers, dormancy fees, inactivity charges or fees, service fees, or expiration dates of gift certificates, store gift cards, or general-use prepaid cards, except to the extent that those laws are inconsistent with the provisions of this subchapter, and then only to the extent of the inconsistency. A State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection afforded by this subchapter. The Bureau shall, upon its own motion or upon the request of any financial institution, State, or other interested party, submitted in accordance with procedures prescribed in regulations of the Bureau, determine whether a State requirement is inconsistent or affords greater protection. If the Bureau determines that a State requirement is inconsistent, financial institutions shall incur no liability under the law of that State for a good faith failure to comply with that law, notwithstanding that such determination is subsequently amended, rescinded, or determined by judicial or other authority to be invalid for any reason. This subchapter does not extend the applicability of any such law to any class of persons or transactions to which it would not otherwise apply.

(Pub. L. 90–321, title IX, §922, formerly §919, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3741; renumbered §920 and amended Pub. L. 111–24, title IV, §§401(1), 402, May 22, 2009, 123 Stat. 1751, 1754; renumbered §921, renumbered §922, and amended Pub. L. 111–203, title X, §§1073(a)(3), 1075(a)(1), 1084(1), July 21, 2010, 124 Stat. 2060, 2068, 2081.)

#### EDITORIAL NOTES

### CODIFICATION

Another section 922 of Pub. L. 90–321 is classified to section 1693r of this title.

Renumbering of section 919 of Pub. L. 90–321 as section 920 by section 401(1) of Pub. L. 111–24 was executed prior to the renumberings of section 920 of Pub. L. 90–321 as section 921 and then as section 922 by sections 1073(a)(3) and 1075(a)(1) of Pub. L. 111–203 as the probable intent of Congress, notwithstanding section 403 of Pub. L. 111–24, set out as an Effective Date note under section 1693l–1 of this title and section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking, which provided that the renumbering by Pub. L. 111–24 was effective 15 months after May 22, 2009, and the renumberings by Pub. L. 111–203 were effective 1 day after July 21, 2010.

### PRIOR PROVISIONS

A prior section 922 of Pub. L. 90–321 was renumbered section 923 and is classified as an Effective Date note under section 1693 of this title.

### AMENDMENTS

**2010**—Pub. L. 111–203, §1084(1), substituted "Bureau" for "Board" wherever appearing.

**2009**—Pub. L. 111–24, §402, inserted "dormancy fees, inactivity charges or fees, service fees, or expiration dates of gift certificates, store gift cards, or general-use prepaid cards," after "electronic fund transfers,".

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by section 1084(1) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

### EFFECTIVE DATE OF 2009 AMENDMENT

Amendment by Pub. L. 111–24 effective 15 months after May 22, 2009, see section 403 of Pub. L. 111–24, set out as an Effective Date note under section 1693l–1 of this title.

## §1693r. Exemption for State regulation

The Bureau shall by regulation exempt from the requirements of this subchapter any class of electronic fund transfers within any State if the Bureau determines that under the law of that State that class of electronic fund transfers is subject to requirements substantially similar to those imposed by this subchapter, and that there is adequate provision for enforcement.

(Pub. L. 90–321, title IX, §922, formerly §920, as added Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3741; renumbered §921, Pub. L. 111–24, title IV, §401(1), May 22, 2009, 123 Stat. 1751; renumbered §922 and amended Pub. L. 111–203, title X, §§1073(a)(3), 1084(1), July 21, 2010, 124 Stat. 2060, 2081.)

#### EDITORIAL NOTES

### CODIFICATION

Another section 922 of Pub. L. 90–321 is classified to section 1693q of this title.

Renumbering of section 920 of Pub. L. 90–321 as section 921 by section 401(1) of Pub. L. 111–24 was executed prior to the renumbering of section 921 of Pub. L. 90–321 as section 922 by section 1073(a)(3) of Pub. L. 111–203 as the probable intent of Congress, notwithstanding section 403 of Pub. L. 111–24, set out as an Effective Date note under section 1693l–1 of this title and section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking, which provided that the renumbering by Pub. L. 111–24 was effective 15 months after May 22, 2009, and the renumbering by Pub. L. 111–203 was effective 1 day after July 21, 2010.

### PRIOR PROVISIONS

A prior section 922 of Pub. L. 90–321 was renumbered section 923 and is classified as an Effective Date note under section 1693 of this title.

### AMENDMENTS

**2010**—Pub. L. 111–203, §1084(1), substituted "Bureau" for "Board" in two places.

#### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by section 1084(1) of Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of Title 5, Government Organization and Employees.

# Attachment B

---

**15 USC Ch. 110: ONLINE SHOPPER PROTECTION**

**From Title 15—COMMERCE AND TRADE**

---

## CHAPTER 110—ONLINE SHOPPER PROTECTION

Sec.
8401.        Findings; declaration of policy.
8402.        Prohibitions against certain unfair and deceptive Internet sales practices.
8403.        Negative option marketing on the Internet.
8404.        Enforcement by Federal Trade Commission.
8405.        Enforcement by State attorneys general.

# §8401. Findings; declaration of policy

The Congress finds the following:

(1) The Internet has become an important channel of commerce in the United States, accounting for billions of dollars in retail sales every year. Over half of all American adults have now either made an online purchase or an online travel reservation.

(2) Consumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business.

(3) An investigation by the Senate Committee on Commerce, Science, and Transportation found abundant evidence that the aggressive sales tactics many companies use against their online customers have undermined consumer confidence in the Internet and thereby harmed the American economy.

(4) The Committee showed that, in exchange for "bounties" and other payments, hundreds of reputable online retailers and websites shared their customers' billing information, including credit card and debit card numbers, with third party sellers through a process known as "data pass". These third party sellers in turn used aggressive, misleading sales tactics to charge millions of American consumers for membership clubs the consumers did not want.

(5) Third party sellers offered membership clubs to consumers as they were in the process of completing their initial transactions on hundreds of websites. These third party "post-transaction" offers were designed to make consumers think the offers were part of the initial purchase, rather than a new transaction with a new seller.

(6) Third party sellers charged millions of consumers for membership clubs without ever obtaining consumers' billing information, including their credit or debit card information, directly from the consumers. Because third party sellers acquired consumers' billing information from the initial merchant through "data pass", millions of consumers were unaware they had been enrolled in membership clubs.

(7) The use of a "data pass" process defied consumers' expectations that they could only be charged for a good or a service if they submitted their billing information, including their complete credit or debit card numbers.

(8) Third party sellers used a free trial period to enroll members, after which they periodically charged consumers until consumers affirmatively canceled the memberships. This use of "free-to-pay conversion" and "negative option" sales took advantage of consumers' expectations that they would have an opportunity to accept or reject the membership club offer at the end of the trial period.

(Pub. L. 111–345, §2, Dec. 29, 2010, 124 Stat. 3618.)

---

### Statutory Notes and Related Subsidiaries

### Short Title

Pub. L. 111–345, §1, Dec. 29, 2010, 124 Stat. 3618, provided that: "This Act [enacting this chapter] may be cited as the 'Restore Online Shoppers' Confidence Act'."

---

# §8402. Prohibitions against certain unfair and deceptive Internet sales practices

### (a) Requirements for certain Internet-based sales

It shall be unlawful for any post-transaction third party seller to charge or attempt to charge any consumer's credit card, debit card, bank account, or other financial account for any good or service sold in a transaction effected on the Internet, unless—

(1) before obtaining the consumer's billing information, the post-transaction third party seller has clearly and conspicuously disclosed to the consumer all material terms of the transaction, including—

(A) a description of the goods or services being offered;

(B) the fact that the post-transaction third party seller is not affiliated with the initial merchant, which may include disclosure of the name of the post-transaction third party in a manner that clearly differentiates the post-transaction third party seller from the initial merchant; and

(C) the cost of such goods or services; and

(2) the post-transaction third party seller has received the express informed consent for the charge from the consumer whose credit card, debit card, bank account, or other financial account will be charged by—

(A) obtaining from the consumer—

(i) the full account number of the account to be charged; and

(ii) the consumer's name and address and a means to contact the consumer; and

(B) requiring the consumer to perform an additional affirmative action, such as clicking on a confirmation button or checking a box that indicates the consumer's consent to be charged the amount disclosed.

**(b) Prohibition on data-pass used to facilitate certain deceptive Internet sales transactions**

It shall be unlawful for an initial merchant to disclose a credit card, debit card, bank account, or other financial account number, or to disclose other billing information that is used to charge a customer of the initial merchant, to any post-transaction third party seller for use in an Internet-based sale of any goods or services from that post-transaction third party seller.

**(c) Application with other law**

Nothing in this chapter shall be construed to supersede, modify, or otherwise affect the requirements of the Electronic Funds [1] Transfer Act (15 U.S.C. 1693 et seq.) or any regulation promulgated thereunder.

**(d) Definitions**

In this section:

**(1) Initial merchant**

The term "initial merchant" means a person that has obtained a consumer's billing information directly from the consumer through an Internet transaction initiated by the consumer.

**(2) Post-transaction third party seller**

The term "post-transaction third party seller" means a person that—

(A) sells, or offers for sale, any good or service on the Internet;

(B) solicits the purchase of such goods or services on the Internet through an initial merchant after the consumer has initiated a transaction with the initial merchant; and

(C) is not—

(i) the initial merchant;

(ii) a subsidiary or corporate affiliate of the initial merchant; or

(iii) a successor of an entity described in clause (i) or (ii).

(Pub. L. 111–345, §3, Dec. 29, 2010, 124 Stat. 3619.)

Editorial Notes

## References in Text

The Electronic Fund Transfer Act, referred to in subsec. (c), is title IX of Pub. L. 90–321, as added by Pub. L. 95–630, title XX, §2001, Nov. 10, 1978, 92 Stat. 3728, which is classified generally to subchapter VI (§1693 et seq.) of chapter 41 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of this title and Tables.

[1] So in original. Probably should be "Fund".

# §8403. Negative option marketing on the Internet

It shall be unlawful for any person to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature (as defined in the Federal Trade Commission's Telemarketing Sales Rule in part 310 of title 16, Code of Federal Regulations), unless the person—

(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information;

    (2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and

    (3) provides simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

(Pub. L. 111–345, §4, Dec. 29, 2010, 124 Stat. 3620.)

# §8404. Enforcement by Federal Trade Commission

### (a) In general

    Violation of this chapter or any regulation prescribed under this chapter shall be treated as a violation of a rule under section 18 of the Federal Trade Commission Act (15 U.S.C. 57a) regarding unfair or deceptive acts or practices. The Federal Trade Commission shall enforce this chapter in the same manner, by the same means, and with the same jurisdiction, powers, and duties as though all applicable terms and provisions of the Federal Trade Commission Act (15 U.S.C. 41 et seq.) were incorporated into and made a part of this chapter.

### (b) Penalties

    Any person who violates this chapter or any regulation prescribed under this chapter shall be subject to the penalties and entitled to the privileges and immunities provided in the Federal Trade Commission Act as though all applicable terms and provisions of the Federal Trade Commission Act were incorporated in and made part of this chapter.

### (c) Authority preserved

    Nothing in this section shall be construed to limit the authority of the Commission under any other provision of law.

(Pub. L. 111–345, §5, Dec. 29, 2010, 124 Stat. 3620.)

#### Editorial Notes

## References in Text

    The Federal Trade Commission Act, referred to in subsecs. (a) and (b), is act Sept. 26, 1914, ch. 311, 38 Stat. 717, which is classified generally to subchapter I (§41 et seq.) of chapter 2 of this title. For complete classification of this Act to the Code, see section 58 of this title and Tables.

# §8405. Enforcement by State attorneys general

### (a) Right of action

    Except as provided in subsection (e), the attorney general of a State, or other authorized State officer, alleging a violation of this chapter or any regulation issued under this chapter that affects or may affect such State or its residents may bring an action on behalf of the residents of the State in any United States district court for the district in which the defendant is found, resides, or transacts business, or wherever venue is proper under section 1391 of title 28, to obtain appropriate injunctive relief.

### (b) Notice to Commission required

    A State shall provide prior written notice to the Federal Trade Commission of any civil action under subsection (a) together with a copy of its complaint, except that if it is not feasible for the State to provide such prior notice, the State shall provide such notice immediately upon instituting such action.

### (c) Intervention by the Commission

The Commission may intervene in such civil action and upon intervening—

    (1) be heard on all matters arising in such civil action; and

    (2) file petitions for appeal of a decision in such civil action.

### (d) Construction

Nothing in this section shall be construed—

    (1) to prevent the attorney general of a State, or other authorized State officer, from exercising the powers conferred on the attorney general, or other authorized State officer, by the laws of such State; or

    (2) to prohibit the attorney general of a State, or other authorized State officer, from proceeding in State or Federal court on the basis of an alleged violation of any civil or criminal statute of that State.

### (e) Limitation

    No separate suit shall be brought under this section if, at the time the suit is brought, the same alleged violation is the subject of a pending action by the Federal Trade Commission or the United States under this chapter.

(Pub. L. 111–345, §6, Dec. 29, 2010, 124 Stat. 3621.)